THE STATE v. LEON WILLIAMS, Appellant.

Division Two, June 16, 1925.

1. INDICTMENT: Prolix Repetitions: Sufficient Allegations.  The repetitions and involved averments of the old prolix forms of indictment are no longer deemed essential; all that is required in formal allegations is that defendant be clearly informed of the nature and cause of the accusation against him.

2. ———: Conclusion: Repetition of Word Aforesaid.  The conclusion of an indictment in the words: "And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Leon Williams the said Harry Leonard in the manner and form and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did kill and murder," etc., is in every respect sufficient.  The word "aforesaid" last used refers to and modifies both "in manner and form" and "by the means," and it was not necessary to insert it after the word "form."

3. CORPUS DELICTI.  The *corpus delicti* is proved by clear proof that the deceased was assaulted and killed, and the identification of defendant as the man who killed him.

4. JURORS: Voir Dire Examination: Death Penalty.  Inquiries by the attorney for the State of veniremen, made to test their competency to sit as jurors in the case, and made for the purpose of ascertaining whether, if the evidence to their minds justified a verdict of murder in the first degree, they would have any conscientious scruples against assessing defendant's punishment at death, and made in the usual stereotyped phrases, do not exact a pledge from them to assess the death penalty in the event they are selected to try the case, and do not invade the province or discretion of the jury to assess his punishment at life imprisonment if they find him guilty; and especially so, where the court instructs the jury that they "must decide which punishment shall be inflicted and so state in their verdict."

5. **CONFESSION.** A written confession of defendant, made without threat or coercion or maltreatment and after warning that what he says may be used against him, as is abundantly established by the testimony of three disinterested men, is admissible in evidence, although at the trial he testifies that before making it he had been beaten and maltreated in many specified ways by police officers in an attempt to compel him to confess; and especially so where the officers deny all such mistreatment, and other facts and circumstances in evidence show that his testimony cannot be true.

6. ———: **Corroborated by Other Testimony.** That the facts stated by defendant in his confession detailing the murder are in essential particulars in exact accord with the testimony of eyewitnesses who had not communicated their knowledge to the officer at the time the confession was made, is a circumstance tending to prove that the confession was not obtained by coercion.

7. ———: **By Third Party: Indictment and Discharge.** Admissions by a third party that he committed the crime charged to defendant, made out of court and without the sanction of an oath, are hearsay, and inadmissible in defendant's behalf. An offer by defendant of the files of the court, showing that a third party had been indicted for the murder of deceased; that a regular bench warrant had been issued for the arrest of said third party, and that the case against him had been dismissed, and an offer to prove that said third party had made a confession admitting that he had killed deceased, are rightly excluded.

8. **DEFENDANT AS WITNESS: Impeachment: Immaterial Question: Rebuttal.** Defendant had testified that scars on his forehead and hand had been inflicted by the police in beating him in an attempt to compel him to confess his guilt, and on cross-examination he was asked if he knew a man named Green, to which he replied that he did. *Held*, that it was not improper for the State, in rebuttal, to show by Green that he had seen the scars on defendant ten months before the confession was made. The question propounded to defendant was not asked for the purposes of impeachment; and the rule that where a defendant is asked an immaterial question for the purpose of impeachment and to affect his credibility, the party propounding the question is bound by his answer, has no application.

9. **TREATMENT OF DEFENDANT: Taken to Office of State's Attorney.** The fact that the attorney for the State, at a noon hour during the progress of the trial, had the sheriff bring defendant to his office, and there, without giving defendant's counsel an opportunity to be present, asked another person, later called as a witness, if he knew defendant, though possibly not strictly conventional,

in no wise deprived defendant of a right or caused him to suffer wrong.

10. **CONSPIRACY: Separate Instructions.** It was not error for the court in one instruction to tell the jury that "all persons acting together with a common intent in the commission of a crime are equally guilty, and a crime so committed by two or more persons jointly is the act of all and each one so acting," and then in another instruction to set out the pertinent facts which would constitute a conspiracy and telling the jury that if defendant and the others went to the place of deceased to commit a crime and in an attempt to commit that crime defendant shot and killed deceased, they should find him guilty, there being no objection to the form or subject-matter of the instructions. Being neither inconsistent nor contradictory, that they were given separately was not prejudicial to defendant's rights.

11. ———: ———: **Requiring a Finding.** It is not necessary that an instruction defining the degree of culpability of persons jointly charged with a crime, who are shown to have acted in its commission with a common intent, to require a finding; explicit directions as to the finding may appear in other instructions. It is only necessary that all be clear, present a harmonious whole, be supported by the evidence, and do not assume the truth of the evidence pertaining to any disputed material issue.

12. ———: ———: **Abstract Propositions.** Where two instructions, read together, concretly state the facts concerning the homicide, as detailed in the testimony, and together constitute a consistent whole, they are not mere abstract statements of the law.

13. ———: ———: **Comment on Evidence: Subordinate Issue.** Where the killing of deceased by defendant, while the main issue, is not the only issue, but the evidence brings into the case a subordinate issue, namely whether defendant and others entered into a conspiracy to commit a crime, and in the perpetration of that crime defendant shot and killed deceased, it is proper for the court by an instruction to tell the jury what facts in evidence, if true and believed, would constitute such conspiracy, and an instruction which correctly does so is not a comment on the evidence.

14. **ALIBI: Instruction: Quantum of Proof.** Where the instruction on alibi given for the State is given in connection with one on reasonable doubt and presumption of innocence, such an instruction declaring that "if the evidence leaves in your minds a reasonable doubt as to defendant's presence at the place where the offense was committed at the time of the commission thereof, you will find him not guilty," sufficiently advises the jury as to the quantum of proof necessary to establish the defense of alibi.

15. ———: ———: **Converse.** When an instruction given at the request of the State embodies all the essential elements of the crime charged and directs the jury that if these be found and believed by them they may find defendant guilty, the defendant is entitled to a converse instruction that if these essentials be not found they may find the defendant not guilty; but where the instruction on alibi given for the State goes further, and tells the jury that if "the evidence leaves in your minds a reasonable doubt as to defendant's presence at the place where the offense was committed at the time of the commission thereof, you will find him not guilty," it is converse enough, and the court does not err in refusing a converse instruction asked by defendant.

16. **INSTRUCTIONS:** Admissions of Defendant as Proof: Credibility: Refusing Defendant's. Where the court gives for the State an instruction which fully and correctly advises the jury as to their duty regarding the admissions and statements of defendant as proofs of the crime and concerning the weight and credibility to be given to such admissions and statements, it is not error to refuse like instructions asked by defendant.

17. ———: False Evidence in Material Matter: Rejection of False Part. An instruction telling the jury that "if you believe any witness has knowingly sworn falsely to any material fact, you are at liberty to reject the portion of such witness's testimony you may believe to be false," is more favorable to defendant than the usual form which authorizes the jury to "reject any portion or all of such witness's testimony;" and, besides, the giving of such an instruction is discretionary with the trial court, dependent upon the facts of each particular case, and unless it appears that such discretion has been abused, to the injury of appellant, its exercise will not be interfered with by this court.

18. **ARGUMENT TO JURY:** Deduced from Evidence: Rebuke: Instructions to Disregard. Remarks of counsel for the State, in the prosecution of a defendant for murder, which, in the main, are deductions drawn from the testimony, will not constitute reversible error, unless it clearly appears that they were prejudicial to him; and the rulings of the trial court in sustaining objections to them carries with them a rebuke of counsel; and non-prejudicial remarks make unnecessary the giving of written instructions telling the jury that all objections to remarks are addressed to the court and are not to be considered by them and that they must decide the case upon the evidence and instructions, but the giving of such instruc-

tions cannot be considered otherwise than as beneficial to defendant.

Corpus Juris-Cyc. References: Conspiracy, 12 C. J., Section 86, p. 577, n. 18. Criminal Law, 16 C. J., Section 1085, p. 559, n. 36, p. 560, n. 46; Section 1278, p. 643, n. 50; Section 1495, p. 728, n. 90; Section 1512, p. 734, n. 20, p. 735, n. 29; Section 2311, p. 941, n. 62; Section 2328, p. 949, n. 96; Section 2331, p. 952, n. 16; Section 2355, p. 964, n. 32; Section 2356, p. 964, n. 40; Section 2376, p. 977, n. 53; Section 2419, p. 1002, n. 21; Section 2442, p. 1017, n. 99, 8; Section 2473, p. 1034, n. 41; Section 2482, p. 1041, n. 14; Section 2493, p. 1049, n. 82; Section 2506, p. 1063, n. 85; 17 C. J., Section 3566, p. 220, n. 1; Section 3571, p. 226, n. 72, 73, 74; Section 3638, p. 297, n. 20, p. 298, n. 22; Section 3729, p. 359, n. 64. Homicide, 30 C. J., Section 291, p. 103, n. 13; Section 529, p. 285, n. 38; Section 589, p. 336, n. 70. Indictments and Informations, 31 C. J., Section 170, p. 650, n. 69; Section 177, p. 658, n. 62. Juries, 35 C. J., Section 437, p. 390, n. 69; Section 441, p. 396, n. 70; Section 445, p. 399, n. 30. Witnesses, 40 Cyc. p. 2771. n. 36; p. 2773, n. 39.

Appeal from St. Louis City Circuit Court.—*Hon. A. F. Ittner*, Judge.

AFFIRMED.

*John R. Davis* and *Paul A. Richards* for appellant.

(1) The reason that the entire evidence was insufficient, in law, to establish the *corpus delicti.* State v. Henderson, 186 Mo. 473; State v. Barrington, 198 Mo. 23; State v. Burgdorf, 53 Mo. 65; State v. Nesenhener, 164 Mo. 461; State v. Francis, 199 Mo. 671; State v. Gordon, 199 Mo. 561; State v. Bass, 251 Mo. 107; State v. Welton, 225 S. W. 965; State v. Parr, 246 S. W. l. c. 906; State v. Stemmons, 262 S. W. 706; State v. Gatewood, 264 S. W. 42. (2) The court erred in allowing the prosecutor, on *voir dire* examination, to pledge the jury to assess the punishment of death, in the event of selection to try the case. Secs. 3461, 4195, 4229, R. S. 1889; Sec. 1817, R. S. 1899; Laws 1907, p. 235; Secs. 3232, 4012, 4047, R. S. 1919; State v. Inks, 135 Mo. 678; State v. Wooley, 215 Mo. 620. (3) The court erred in admitting in evidence the alleged confession of the defendant. State v. Stebbins, 188 Mo. 387; State v.

Ellis, 294 Mo. 269. (4) The court erred in excluding evidence, offered by the appellant, as to one Joseph Walker, containing matters and things alleged to be the confession of appellant. Underhill's Crim. Evidence (3 Ed.) sec. 219; State v. Thomas, 250 Mo. 189; State v. Barrington, 198 Mo. 97. (5) The court erred in permitting witness Daniel Webster Green to testify in rebuttal. State v. Cox, 263 S. W. 219; 28 R. C. L. p. 419, sec. 2; Williams v. Arkansas, 188 S. W. 826; L. R. A. 1917B, p. 586. (6) The court erred in giving and reading to the jury, on its own motion, instructions numbered 1 and 5. Criminal Law, 16 C. J. sec. 2485, p. 1043; State ex rel. v. Morrison, 244 Mo. 193; State v. Bird, 228 S. W. 751; State v. Mahood, 177 S. W. 371; State v. Green, 229 Mo. 642; State v. Rollins, 226 Mo. 524; State v. Elsey, 201 Mo. 561. (7) The court erred in refusing to read and give to the jury appellant's Instruction G, and in giving and in reading this instruction to the jury in a modified form. Sec. 4025, R. S. 1919; State v. Hale, 156 Mo. 102; State v. Cox, 264 Mo. 408; State v. Weisman, 256 S. W. 740; State v. Worten, 263 S. W. 124; State v. Majors, 237 S. W. 486. (8) The court erred in refusing to give and read to the jury appellant's offered instructions numbered C and D. State v. Cox, 264 Mo. 408; State v. Moore, 61 S. W. 199; State v. McNeal, 237 S. W. 738; Oliveros v. State, 47 S. E. 627. (9) The court erred in allowing the Assistant Circuit Attorney to indulge in improper argument before the jury, in failing to instruct the jury to disregard, and in failing to reprimand said attorney. State v. Burns, 228 S. W. 766; State v. Thompson, 238 S. W. 115; State v. Hess, 240 Mo. 147; State v. Cole, 252 S. W. 699; State v. Seward, 247 S. W. 151; State v. Dengel, 248 S. W. 603; State v. Connor, 252 S. W. 713; State v. Houston, 263 S. W. 219; State v. Levy, 262 Mo. 181; State v. Upton, 109 S. W. 821; State v. Clancy, 225 Mo. 654. (10) The indictment filed in the instant case does not charge an offense, punishable under the laws of the State of Missouri. State v. Pemberton, 30 Mo. 376; State v. Privitt,

175 Mo. 207; State v. McDaniel, 94 Mo. 301; State v. Jones, 20 Mo. 58; State v. Reakey, 1 Mo. App. 3; State v. Cook, 170 Mo. 210; State v. Wade, 47 S. W. 1070; State v. Banks, 118 Mo. 117.; State v. Meyers, 99 Mo. 107; State v. Rector, 23 S. W. 1074; State v. Jones, 20 Mo. 58.

*Robert W. Otto,* Attorney-General, and *Wm. L. Vandeventer,* Assistant Attorney-General, for respondent.

(1) The *voir dire* examination of the jury by the prosecutor was proper. Sec. 4012, R. S. 1919; State v. Sherman, 264 Mo. 374; State v. Hayes, 262 S. W. 1035; State v. David, 131 Mo. 380; State v. Tevis, 234 Mo. 276.; State v. Wooley, 215 Mo. 620; State v. Murphy, 292 Mo. 275; State v. Gilbert, 186 S. W. 1003; State v. Hays, 262 S. W. 1034. (2) The admission into evidence of the alleged confession of the defendant was proper. State v. Armstrong, 203 Mo. 554; State v. Brooks, 220 Mo. 74; State v. Spaugh, 200 Mo. 571; State v. Jones, 171 Mo. 401; State v. Brennan, 164 Mo. 487; State v. Wilson, 223 Mo. 173; State v. Ruck, 194 Mo. 416; State v. Meyer, 293 Mo. 108; State v. Reich, 293 Mo. 415; State v. McNeal, 237 S. W. 741; State v. Reich, 239 S. W. 837. (a) A confession is *prima-facie* presumed to be voluntary until the contrary is shown. State v. Hayes, 247 S. W. 168; State v. Seward, 247 S. W. 153; State v. Reich, 239 S. W. 837; State v. Armstrong, 203 Mo. 554. (b) The denial of its voluntary character makes it a matter of fact to be decided by the jury. State v. Hayes, 247 S. W. 165; State v. Seward, 247 S. W. 150. (3) The court did not commit error by the exclusion of the evidence offered by the appellant as to one Joseph Walker, which evidence purported to be an alleged confession of Walker. Donnelly v. United States, 228 U. S. 243; State v. Barrington, 198 Mo. 97; Underhill's Crim. Evidence, sec. 238, p. 340; State v. Schyhart, 199 S. W. 205; State v. Duncan, 116 Mo. 288; State v. Taylor, 136 Mo. 73; State v. Evans, 55 Mo. 460; 3 Wigmore on Evidence, secs. 1476, 1477; State

309 Mo. Sup.—11.

v. Mann, 83 Mo. 589; Tillman v. State, 166 S. W. 582; 2 Wharton on Crim. Evidence, sec. 622d; State v. Hack, 118 Mo. 92. (4) The court properly admitted the testimony in rebuttal of witness Daniel Webster Green. This is a matter largely in the discretion of the trial court. State v. Baker, 262 Mo. 689; State v. Burgess, 193 S. W. 821; State v. Dilts, 191 Mo. 673; State v. Ferguson, 278 Mo. 119; State v. Weiss, 219 S. W. 368; State v. Murphy, 292 Mo. 275. (5) The court committed no error in the giving of Instructions 1 and 5. (a) Number 1 is merely an abstract statement of the law and is not defective because of an assumption. The repetition of the subject matter in 1 and 5 is not reversible error. State v. Sebastian, 215 Mo. 86. (b) The evidence was sufficient to give both instructions based on conspiracy. State v. Kennedy, 177 Mo. 118; State v. Collins, 181 Mo. 261; State v. Ruck, 194 Mo. 416; State v. Lewkowitz, 265 Mo. 613; State v. Sykes, 191 Mo. 78; State v. Darling, 199 Mo. 199; State v. Lewis, 273 Mo. 518; State v. Carroll & Jacoy, 288 Mo. 392. (6) The court committed no error in refusing defendant's Instruction G and submitting in lieu thereof Instruction 8. No error is committed by a court in refusing an instruction if the instruction given in lieu thereof is substantially the same and covers the laws in the case. State v. McWilliams, 267 Mo. 437; 16 C. J. sec. 2375, p. 976; State v. Jones, 153 Mo. 457; State v. Brooks, 220 Mo. 74; State v. Harris, 177 S. W. 355. (7) Instruction 8 properly submitted to the jury the law as to the defense of an alibi. State v. Hillebrand, 285 Mo. 290; State v. Bonner, 259 Mo. 342; State v. Glasscock, 232 Mo. 278; State v. Barton, 214 Mo. 316; State v. Anglin, 222 S. W. 776; State v. Brown, 247 Mo. 715; State v. Shelton, 223 Mo. 118. (8) The court committed no error in refusing defendant's instructions C and D. It is not error to refuse a special instruction, although it states a correct principle applicable to the case, if it has already been covered properly and sufficiently by another instruction. State v. McWilliams, 267 Mo. 437; State v. Gilbert, 186 S. W. 1003;

State v. Cariou, 266 Mo. 82; State v. Harris, 177 S. W. 355. (9) Instruction 6 given by the court sufficiently instructed the jury as to law of confessions or statements by defendant. State v. Simenson, 263 Mo. 264; State v. Merkel, 189 Mo. 315; State v. Wisdom, 119 Mo. 539; State v. Hamilton, 263 S. W. 131; State v. McCleane, 256 S. W. 814; State v. Long, 253 S. W. 729; State v. Knowles, 185 Mo. 141; State v. Johnson, 252 S. W. 623. (10) The argument of the Assistant Attorney before the jury was proper. State v. Baker, 262 Mo. 689; State v. Gartrell, 171 Mo. 489; State v. Rasco, 239 Mo. 535; State v. White, 299 Mo. 599; State v. Prison, 236 S. W. 357; State v. Prunty, 276 Mo. 359; State v. Sherman, 264 Mo. 374; State v. Rogers, 253 Mo. 399; State v. Hewitt, 259 S. W. 780; State v. Shour, 196 Mo. 202; State v. Julin, 292 Mo. 265; State v. Williams, 191 Mo. 205; State v. Murchie, 225 S. W. 954; State v. Martin, 230 Mo. 680; State v. Reich, 239 S. W. 837. (11) The indictment in instant case was sufficient and properly charged the defendant. State v. Ferguson, 278 Mo. 119; State v. Privitt, 175 Mo. 207; State v. Patterson, 73 Mo. 695; State v. Gleason, 172 Mo. 259; State v. Jones, 134 Mo. 254; State v. Adkins, 284 Mo. 680; State v. Stokes, 288 Mo. 539.

WALKER, P. J.—At the December term, 1923, of the Circuit Court of the City of St. Louis, the appellant and several other negroes were jointly indicted for the murder of a white man named Harry Leonard. A severance was granted and the appellant was separately tried in June, 1914, convicted of murder in the first degree, and his punishment assessed at death.

On December 30, 1923, the deceased and his wife kept a soft drink parlor on the corner of Randolph and Twenty-second streets in the city of St. Louis. The room where the business was conducted was on the ground floor of a building, the entrance to which was on Randolph Street. A bar, such as was formerly used in saloons, extended along the room from the south to the north. The room was divided by swinging doors. In

the portion of the room north of these doors and parallel with the bar was a cigar case, directly in the rear of which was a large safe, which stood against the west wall of the building. The deceased and his wife had conducted the business named at the place stated for about three years. The section was inhabited almost exclusively by negroes, who were the principal patrons of the place.

About 11:30 P. M. on Sunday night, December 30, 1923, a negro man entered the business place of the deceased and ordered and drank a glass of root-beer, which was served to him by the deceased. About the same time another negro entered and bought a package of cigarettes. These two left the room separately soon thereafter. Immediately after they left the room the wife of the deceased went behind the bar and began to wash her hands. While she was thus engaged three negroes rushed into the room, ordered those present to "stick 'em up." Everyone obeyed the order, except the deceased, who, when the men rushed into the room, instead of putting up his hands when ordered so to do, walked the length of the bar, stooped down and leaned on his left side against the safe. At this juncture two of the negroes ran out of the room, and the other leaned over the cigar counter and began to shoot at the deceased, who was then almost down on the floor at the base of the safe. After firing several shots this negro left the room. The deceased was taken to a hospital, but died soon after his arrival there. An autopsy disclosed that he had died from a hemorrhage resulting from a gun-shot wound in the back.

The appellant was identified by the wife of the deceased as the man who did the shooting, and that he was the negro who came in and bought the glass of root-beer a short time before he shot the deceased. Her testimony in regard to the identification of the appellant as the man who killed her husband is thus succinctly stated by the counsel for the appellant:

"On Tuesday morning following the killing, Mrs. Leonard, the deceased's wife, visited the Eighth District Police Station and found four colored men in the custody of the police; one of them was identified by her as the colored men who had entered the room and purchased the root-beer. She also identified him as the man who leaned over the cigar counter and did the shooting which resulted in her husband's death."

In addition she testified that she "was very close to the appellant at the time and had a direct view of his face and could not be mistaken as to his identity."

On the morning of the identification of the appellant by Mrs. Leonard he indicated that he desired to make a statement and was told by the Assistant Circuit Attorney, and a police officer in whose charge he was at the time, that whatever statement he made would probably be used against him. He was further asked if he had been threatened or intimidated in any way by police officers and answered that he had not. A number of inquiries were made of him by the Assistant Circuit Attorney prior to his confession as follows: "Have you in any way been abused, put under duress or fear; have you been promised immunity by the police or any one else; have you any hope of reward?" In addition to his negative answers to each of these inquiries, he stated that in making a statement he simply wanted to tell the truth. He was then told to go ahead. Whereupon he made an oral statement which was reduced to writing in his presence and after being read to and examined by him he said it was correct, and signed his name thereto in the presence of the police officers, the Assistant Circuit Attorney and two disinterested business men of St. Louis who were called in by the Captain of the Police or the Assistant Circuit Attorney to listen to the appellant's statement and testify as to the circumstances under which it was made. This statement is as follows:

"My name is Leon Williams; colored; twenty-four years of age; born in Alabama; single. Employed by the Municipal Asphalt Company, city of St. Louis. I

reside at 2617 North Leffingwell Avenue; and make the following statement of my own free will and accord, and without any promises on the part of Lieutenant James P. Gunn or Officer Douglas Chamblin or Walter Cliffe on the part of the police department.

"About nine or 9:30 o'clock P. M. on December 30, 1923, I met Josh Cartwright, George Baker and a colored man named Reuben Bobbitts in the soft-drink parlor and dance hall conducted by Joseph Walker at 2917 Chouteau Avenue; and Josh Cartwright made the suggestion that we go out and get some money. We agreed and I told him that I knew a saloon that kept open late at night and I thought the saloonkeeper had some money. We got a car from a garage at the rear of Walker's parlor, and Cartwright drove us to 22nd Street and Randolph. I and Baker got out of the machine and I walked east to 22nd Street to a soft-drink parlor, where I entered and purchased a glass of root-beer, and while I was drinking it Baker entered the place and purchased a package of cigarettes. Baker then left the place and I drank the root-beer and followed him. Our purpose in entering the place was to see if everything was clear, and while I was in the place Baker and I did not speak to each other, as we did not want the man behind the bar to know we were together. After Baker and I left the soft-drink parlor we walked back to the machine. Baker said, 'Everything is all right. Let's go and make it.' We then got our revolvers from the car and walked east to the soft-drink parlor, and Bobbitts entered the place first, followed by Baker and me. We entered the swinging doors, and Bobbitts said, 'Stick 'em up and keep quiet.' Bobbitts and myself each had a revolver in our hands, and as we entered the door Bobbitts cocked his revolver. The bar-tender was sitting behind the counter. There was also a woman standing in front of the parlor behind the bar. Bobbitts told the bar-tender to get up, and if he did not he would shoot him. The bar-tender then got up and started to walk slowly towards the front part of the parlor, and Bobbitts kept him covered

with his gun. As the bar-tender was passing the woman he stumbled, but he did not fall. Bobbitts and Baker then ran out of the parlor. Thinking that the bar-tender was reaching for a revolver I fired one shot at him, and then I started towards the door. The bar-tender started to straighten up and I thought that he had a revolver and I ran back and leaned over the counter and fired two more shots at him. I then ran out of the front door and went west on Randolph Street to the machine, which had just started off and which was occupied by Baker and Cartwright and Bobbitts. I jumped on the left-hand side of the machine and opened the door and got into the car, and Cartwright drove west to Jefferson Avenue, south to Chouteau and west to Ohio Avenue, and north to the alley and west in the alley to the garage in the rear of 2817 Chouteau Avenue, where the car was put away. We then went to the rooms occupied by Walker in the rear of 2817 Chouteau and left our revolvers. Bobbitts and I then went to the dance hall in the front part of the building, and after a few minutes Walker, Cartwright and Baker came to the dance hall. We then bought a half pint of whiskey, which we drank. Baker and I then went to his home, where I remained until about one o'clock A. M. I left to get a street car, and I noticed some officers near Jefferson Avenue and I became frightened and returned to Baker's home, where I remained until five o'clock A. M., at which time I left and went to my home. The small blue steel revolver which is held by the police is the revolver which I used to do the shooting with. The large blue steel revolver which is held by the police is the revolver which Bobbitts carried during the holdup.                LEON WILLIAMS."

This confession was witnessed at the time by those present signing their names thereto.

On the witness stand the appellant denied that he made the confession. That he was arrested early Tuesday morning, January 1, 1924, and was taken to the Eighth District Police Station. At about 8:30 or nine o'clock A. M. a policeman came and took him out of a

cell and questioned him about the killing of Harry Leonard; that he told the officer he knew nothing about it. The latter put him back in the cell, and a short time thereafter took him out again, and upon his continued denial of any knowledge of the killing slugged him with a black jack, knocked him through a glass door and otherwise abused and maltreated him. That despite this treatment he persisted in declaring his innocence. That the Sunday night when he is charged with having killed Leonard he was at a dance hall and remained there until about 12:30 o'clock, when he went home with his wife and remained there until the next morning.

The substance of the appellant's testimony in regard to the making of the confession was that some time during the afternoon of the day of his arrest he was again taken from the cell in which he was being held, and he remembered signing some paper; that he didn't know what it was at the time or when it was made. That Cliffe (the police officer) had taken him back to the Captain's office, and he said, "Sign right here;" that the paper was not read to him; that he asked what it was and "he said, 'Oh, nothing, just sign your name;' that's all he said;" that the first time he ever saw the confession his lawyer showed it to him in jail and read it to him.

Arthur L. McGuire, Captain of Police, to whose office the appellant was brought, testified that a short time before the confession is alleged by the State's witnesses to have been made, the appellant was brought into the Captain's presence in the forenoon of the day of his arrest, and that he made an oral statement in regard to the murder of Harry Leonard soon after he was brought in. When it had been made the Captain asked the appellant if he was willing to sign a written statement of the facts he had just related and he said he was willing to do so; that such a statement was prepared by the Captain's clerk in long-hand, which was read to the appellant by the Captain and then handed to the appellant for examination; that he examined the same for several minutes and then signed; that the freedom of his action in affix-

ing his signature to this statement was in no manner interfered with and no attempt was made to conceal any portion of the statement from him, but every opportunity was afforded to enable him to act freely and to know what he was doing; that appellant had no fresh scars on his head or face that day, made no complaint to him or any one else, of which he has any knowledge, that appellant had been abused or maltreated; that no door was broken down or the glass in a door at the police station shattered on the day the appellant was brought to his office.

Captain McGuire further testified that during all of the time the appellant was making his statement and shortly before and after it was made the Assistant City Attorney, Roy A. Fish, Lieut. Gunn, Officers Chamblin and Cliffe and two business men of the city, one named Reynolds and another whose name the witness could not recall, were present, and that they signed the statement as witnesses.

At the close of the officer's testimony a witness named Green testified on behalf of the State that he had known the appellant for about a year, and that during all that time the scar on the left side of his forehead that appellant stated had been made by a police officer was on his forehead.

Roy A. Fish, Assistant Circuit Attorney, testified as to his presence at Captain McGuire's office at the time appellant made and signed the statement; that while at the office about ten o'clock in the forenoon, January 1, 1924, the appellant was brought into the witness's presence. The latter's language is as follows:

"I told him that he faced a serious charge, that of murder; that my purpose in being there was to advise him of his rights; that he could make a statement or not as he saw fit, but if he made a statement in all probability it would be used against him at his trial. I asked him if he wanted to make a statement, and I also asked him a number of other questions first; if he had been abused by any member of the police department or anybody

else, and he said he had not; if he had been struck, threatened or intimated, and he said he had not; or if duress of any kind had been used to induce him to make a statement, and he stated there had not, but that he had been treated fairly. These were his words. I then asked him if the police department or anybody else had promised him immunity or had told him it would be easier on him if he told the truth. He said they had not. I asked him why he wanted to make a statement, and he said because he wanted to tell the truth.

"He then proceeded to make the statement here in evidence. It was written down in long-hand by Captain McGuire's clerk and after being read to the appellant by the Captain and also examined by the appellant he signed it and I, with others present, placed our names thereon as witnesses."

Wm. F. Hellman, a machine-shop foreman, who was present when the appellant made the statement, identified him as the maker of same; and testified that he heard appellant make it orally, and that it was reduced to writing, read to the appellant by Captain McGuire and thereafter examined and signed by the appellant. That the latter was not mistreated, abused or threatened in any manner, nor were any promises or offers of immunity extended to him to induce him to make the statement. The witness's testimony without repeating, same, corroborated that of the witness Fish in every material particular. Hellman said he signed his name as a witness to the statement.

Claude E. Reynolds, the other business man present, further corroborated the testimony of Fish and Hellman as to what occurred at Captain McGuire's office when the appellant made the statement, and that he signed the same as a witness thereto. Officer Cliffe was charged by the appellant with maltreating him, but denied that he had mistreated the appellant in any manner. His testimony, while given in the absence of the jury, is not properly incorporated in the bill of exceptions, as is the case with many other pages of the transcript submitted

for our consideration. However, the counsel for the defense has seen fit to characterize the testimony of this officer as a "perfunctory denial" and it is therefore not proper to refer to it here.

The burden of the testimony of the witnesses for the appellant was to establish an alibi. Aside from, the testimony of the appellant himself, some three or four others of his own race and residents of the neighborhood where he lived stated that he was elsewhere than at the scene of the murder at the time it was shown to have been committed. A like number of the same class of witnesses testified as to the good character of the appellant.

I. The formal sufficiency of the indictment is challenged. It is contended that the conclusion of same is **Indictment.** defective in that the manner and form in which Harry Leonard, the deceased, was killed, is not referred to. The conclusion is as follows:

"And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Leon Williams" (and the others jointly charged) "the said Harry Leonard in the manner and form and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly, and of their malice aforethought, did kill and murder.; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

Appellant's specific objection to the indictment is that it omits the word "aforesaid" after the word "form" in the conclusion; and that the comma after the phrase "in the manner and form" makes it impossible for the word "aforesaid" which follows the word "means" to refer to and include the phrase "in manner and form" and therefore the conclusion fails to state in what manner and form the deceased Harry Leonard was killed.

If we resort to precedents, those fetishes of the common law, to guide us in the construction of this indictment, the reports are replete with cases holding like indictments to be sufficient. An examination of the indictments construed in the cases cited by counsel for re-

spondent will furnish proof of the correctness of this conclusion. However, if we ignore the rule of reference and construe the indictment by the words employed therein in connection with their relation to each other, little difficulty is encountered in determining its meaning. The repetitions and involved averments of the old prolix forms of indictment are no longer deemed essential by modern courts in the construction of pleadings in criminal cases. All that is or should be required as to formal allegations or that a defendant is entitled to demand, is that he be clearly informed of the "nature and cause of the accusation" against him. A court which would hold invalid a criminal charge which meets this measure would fall short of a proper administration of the criminal law and thwart justice by the interposition of hairsplitting technicalities.

The conclusion of this indictment, read, as it can only be intelligently read, in the light of the language employed, must be construed as meaning that "the manner and form and means," conjunctively used, followed by the word "aforesaid," has direct reference to the theretofore averred use of a pistol and the discharge of same by the appellant in the killing of Harry Leonard. Descending to the *de minimis* portion of the appellant's contention in this regard, it might be enough to say that in the copy of the indictment before us, no comma appears after the phrase "in manner and form." If it did appear and the meaning of the words employed was unmistakable, as they are in this case, punctuation, or the lack of it, would not suffice to change it. The annals of Congress furnish an apposite and amusing incident illustrative of this truth. The construction of a treaty was under discussion. A senator contended that the meaning of a clause was to be determined by the presence of a comma. The ever ready Randolph, in reply, said: "Am I to understand that the learned senator would determine the destiny of a nation by the absence or presence of a fly speck?"

II.   It is contended that there was no proof of the *corpus delicti*.  That Harry Leonard was killed was clearly proved; and that the appellant killed him was shown by his identification as the perpetrator of the crime, his confession, and the proof of other relevant facts and circumstances corroborative of the two essentials necessary to establish the body of the crime.  In the face of these facts the conclusion is authorized that this contention is without merit.

Corpus
Delicti.

III.   Error is assigned as to the manner in which the jurors were examined by the counsel for the State to test their competency to sit as triers of the facts, or as we say in the terminology of the law, upon their *voir dire*.  In passing, it is evident that this much-used and often-abused term had not become firmly embedded in the vocabulary of counsel for both parties, as it is designated by each as the *"voir doir"* examination of the jurors.  This might be charged to the conventional culpability of the typewriter were it not for the frequency of its use in both briefs.  This will not deter us from seriously considering whatever merit may inhere in this contention.

Examination
of Jurors.

Appellant's assignment, stripped of unmeaning terms, is, in effect, that the jurors were practically pledged by the prosecutor to assess the penalty of death in the event of their selection to try the case; that this conduct on the part of the State invaded the province of the jury, and deprived the appellant of a substantial right accorded to him by law, that of being tried by a jury vested with discretion as to the grade of punishment to inflict.

Counsel for neither side have set forth the inquiries made by the attorney for the State in the *voir dire* examination.  These inquiries embody the error, if it exists, of which the appellant complains.  We must resort therefore to the transcript of the proceedings, preliminary to the trial, to enable us to intelligently dispose of this contention.  This record discloses that the inquiries to which objections are interposed are in effect as fol-

lows: "Where the evidence to your mind establishes murder in the first degree could you or could you not vote for the infliction of the death penalty? Could you under any circumstances, where the evidence showed beyond a reasonable doubt the guilt of the defendant, vote for the imposing of the death penalty? Do you believe in the strict, fair and impartial enforcement of the criminal law as to all persons and all offenses, including murder in the first degree? Have you any conscientious scruples against capital punishment?"

As stated, the gist of appellant's contention is that these inquiries tended to limit the jury's consideration and finding as to capital punishment. Viewed compositely, rather than as separate inquiries, by which the appellant may have the advantage of an interpretation most favorable to his contention, is there anything in the language employed which may properly be construed as limiting or destroying the discretion of the jury? The burden of these inquiries was to ascertain whether, if the evidence to the minds of the jury justified the verdict, would they have any conscientious scruples against a death penalty. This was, in effect, no more than the stereotyped inquiry made in like cases.

If, under the strictest consideration, the inquiries can be construed as attempting to limit the jury's discretion the instructions of the court removed that limitation in unequivocal terms, which the jury could not fail to understand, as follows:

"If, under the evidence and the instructions in this case, the jury finds the defendant guilty of murder in the first degree, the law provides that the defendant shall suffer death, or be punished by imprisonment in the penitentiary during his natural life; and the jury must decide which punishment shall be inflicted, and so state in its verdict."

To the unbiased mind therefore no tenable ground exists on which the contention can be based that the jury was in anywise prevented from deciding whether the appellant, if found guilty, should be punished capitally or

given a life sentence. We must presume that the jurors were of average intelligence and having been qualified would determine the issue of guilt and the extent of the punishment under the facts adduced and the law as declared by the court. Thus guided there is no room for the implication (and there is nothing more) that their discretion was destroyed by the inquiries of the counsel for the State. To so hold would be equivalent to finding that they had deliberately ignored the express declaration of the court as to the extent of their power in assessing the punishment. While much latitude is given counsel in the examination of an array to test the competency of the jurors, the safest plan is to couch these inquiries in language which has received the approval of this court. Thus framed no possible basis would exist for such contentions as are here made. Fully satisfied, however, in this case, that the jury was not misled and that the appellant suffered no injury we overrule this contention.

IV. Error was not committed in the admission in evidence of the confession of the appellant. Only his testimony, on its face inconsistent and contradictory, was offered in denial of the making of the confession or to sustain his contention that his signature thereto was made by him under coercion and when he had no knowledge of what he was signing. Four reputable witnesses directly contradicted these statements and testified unequivocally that not only was the confession voluntarily made, but that the appellant was explicitly informed of his rights in the premises and that his confession, if made, would be used against him at the trial. In addition, the correlative facts and circumstances, which in weighing human testimony may be invoked to weaken or lessen the verity of same, all tend to detract from the truth of the appellant's testimony and to strengthen that of the witnesses for the State.

To illustrate, many of the facts relevant to the commission of the crime as set forth in the confession could only have been known at the time of the making of the

confession by the appellant and Mrs. Leonard, the widow
of the deceased.   Their correctness as to detail as set
forth in the appellant's statement was subsequently cor-
roborated by her.   There is no evidence that she com-
municated these facts to those who transcribed the con-
fession, or that they had or could have had any knowl-
edge of same sufficient to enable them to formulate or,
as the appellant now contends, fabricate the facts there-
in set forth for the purpose of palming it off upon the
trial court and the jury to secure the appellant's convic-
tion.   However, the jury, more competent from personal
contact with the witnesses to determine the truth of
their testimony than is afforded by a cold record, and
possessed, as we must presume, with at least the average
ability of sane men to test the truth of the witnesses'
testimony, refused to believe his denial that he made the
confession, and thereby put the stamp of their approval
on the testimony of the witnesses for the State.   Even
if an opportunity was afforded for the widow of the
deceased to communicate the facts in regard to the kill-
ing to those who heard and witnessed the confession, it
must be held, in order to give credence to the appellant's
oral testimony, that the Assistant Circuit Attorney, the
police officers and two disinterested citizens have crim-
inally conspired to manufacture testimony to secure the
appellant's conviction.   Such a conclusion is contrary to
human experience and an insult to the reason of any one,
layman or lawyer, capable of determining between truth
and falsehood.   That there have been instances in the
criminal annals of this State where maltreatment and
coercion have been employed to extort confessions of
guilt from persons charged with crime, it may be ad-
mitted; but, whenever such cases have been brought to
the attention of this court, supported by evidence worthy
of belief, we have condemned the practice and have re-
versed and remanded the cases.   Such a case is not here
presented and the contention cannot be sustained.

V.   The correctness of the trial court's ruling is
challenged in excluding the offer of the appellant to in-

troduce in evidence the files of the circuit court in the case of the State of Missouri v. Joseph Walker, which, it was alleged by counsel for the appellant, would show that Walker had been indicted for the murder of Harry Leonard and had not been prosecuted for that crime. The purpose of this offer, as stated by counsel, was to furnish a connecting link explanatory of appellant's confession. How or in what manner it would have accomplished this purpose is not intimated. The trial court refused to permit these files to be introduced in evidence.

*Confession of Third Party.*

Subsequently counsel for appellant offered to prove by the latter, then on the witness stand, that he had seen a statement purporting to be a confession by Joseph Walker. This testimony was excluded by the trial court. Thereafter counsel offered to show "that Joseph Walker had been indicted by the grand jury for the murder of Harry Leonard, and a regular bench warrant issued for his arrest and the case assigned to Division Number Eleven of the Circuit Court of St. Louis, Missouri, where it was dismissed by the State."

Offers of testimony of this character are classified as hearsay and are excluded by courts which adhere to the rules of evidence established by the common law. The reasoning of Mr. Justice PITNEY, speaking for the Supreme Court of the United States, in Donnelly v. United States, 228 U. S. 1. c. 273, is pertinent and furnishes convincing reasons to sustain the correctness of the trial court's exclusion of this character of testimony. These reasons are, in effect, as follows: That such a confession, if in fact made, is not under the sanction of an oath; that it entails no responsibility on the part of the declarant for error or falsification; that it affords no opportunity for a court, jury or the parties, to observe the demeanor and temperament of the declarant and to search his motives and test his accuracy and veracity by cross-examination. These important safeguards of truth, present when a witness testifies in person, are therefore lacking. The conclusion in the Don-

309 Mo. Sup.—12.

nelly case, in this regard, was in effect, that the admission of this character of evidence would so relax the ordinary safeguards as to greatly multiply the probabilities of error, and that hearsay evidence was an unsafe reliance in a court of justice. "In this country," says the learned Justice, "there is a great and practically unanimous weight of authority in the state courts against admitting evidence of confessions of third parties made out of court and tending to exonerate the accused."

In that excellent treatise on Criminal Evidence by Underhill it is tersely stated that "the incriminating statements of a third person that he committed the crime for which the accused is on trial are hearsay; that such persons must be produced as witnesses." [Underhill Cr. Ev. (3 Ed.) sec. 238, p. 340.]

Authority is not lacking in this State in support of this rule. In State v. Hack, 118 Mo. 92, it is held that in a criminal case the defendant cannot introduce the admissions of a third party tending to show that he, and not the defendant, committed the crime charged. A like rule was earlier announced in State v. Duncan, 116 Mo. 288, in which it was held that evidence, in a trial for murder, that a person other than the defendant admitted that he had done some shooting at the time and place of the homicide was hearsay and inadmissible. While the accused may disprove his guilt by proving the guilt of some other person, he cannot do this by the introduction of an extra-judicial confession or the declaration of another person that he intended to or did commit the crime. [Underhill Cr. Ev. (3 Ed.) sec. 238, p. 341, and cases cited under note 99.] The contention that the trial court erred in the exclusion of this testimony is therefore without merit.

VI. The appellant complains of the action of the trial court in permitting the State to examine in rebuttal a negro named Daniel Webster Green. This complaint is sought to be based on the rule that where a defendant

is asked an immaterial question for the purpose of im-
peachment and to affect his credibility, the party
propounding the inquiry is bound by his an-
swer. The correctness of this rule of evidence, under a
state of facts which conforms to the requirements of
the rule, need not be questioned. [State v. Cox, 263 S.
W. (Mo.) l. c. 219, and cases cited.] However, the facts
in the instant case do not conform to such requirements.
To have done so it would have been necessary: first, for
the inquiry made by counsel for the State to have been
immaterial; and, second, for the appellant to have an-
swered it in the negative. He was asked on cross-
examination if he knew a man by the name of Green. To
which, evidently not understanding the question, he
said, "What?" Counsel for the State in explanation of
his inquiry, said: "Green, a colored man; do you know
him?" In reply the appellant said: "I don't know no
white fellow; I know a colored man's name; I don't know
whether it is the one you are talking about or not."
Further examined, the appellant explained where and
under what circumstances he had known Green—not nec-
essary to be detailed here. Green was examined by coun-
sel for the State in rebuttal, not to contradict the ap-
pellant as to his acquaintance with the latter, but to show
that inside of a year or ten months before the trial the
witness had frequently seen the appellant and at those
times he had a scar on his left hand and another on his
forehead, over one of his eyes. This testimony was
admissible to contradict that of the appellant that the
scars referred to were caused by his abuse and injury
inflicted by the police after his arrest for the killing of
Harry Leonard. This examination was therefore proper
and there is no merit in this complaint.

Another phase of the foregoing assignment having
to do with the conduct of the attorney for the State, is
that he caused the sheriff to bring the appellant to his
office during the progress of the trial and to ask

*Rebuttal.*

Confronting Defendant with Witness. Green, who was also present, before he was put on the witness stand, if he knew the appellant. According to the testimony of the State's counsel and Green this was the extent of the inquiry. The appellant on the contrary states that he in turn was interrogated by the counsel for the State as to his knowledge or acquaintance with Green. If appellant's version of the transaction be true, although no credence seems to have been given to it by the jury sufficient to influence their verdict based upon the relevant facts in the case, how was the appellant thereby injured? The burden of the complaint of counsel for the appellant in regard to this matter, stripped of conjectures and assumptions of improper conduct on the part of the State's counsel, is, that they were not given an opportunity to be present when Green identified the appellant. The conventionalities of the drawing room may have been violated by this conduct, but the appellant was thereby deprived of no right and suffered no wrong. This is the test by which the materiality of a complaint concerning the conduct of a prosecuting officer is to be determined. Without intending to manifest impatience in the disposition of this contention it seems enough to say that it is trivial.

VII. The giving by the court of instructions numbered one and five at the request of the State is assigned as error. These instruction are as follows:

Separate Instructions. "1. All persons acting together with a common intent in the commission of a crime are equally guilty, and a crime so committed by two or more persons jointly is the act of all and each one so acting.

"5. The court instructs you that when two or more persons enter into an unlawful agreement or understanding, whether such agreement or understanding be tacit or expressed, to aid and assist each other in the commission of a crime or series of criminal acts, where the crime or crimes contemplated are such that in the prosecution

thereof the natural and probable consequences are that human life will be put in jeopardy, and if in the carrying out of such unlawful design a human life is taken by any one of the conspirators, each of the others are equally responsible for such killing, even though at the time such understanding and agreement was entered into such killing was not intended or within the contemplation of the parties as a part of the original design. In this connection you are instructed that if you believe and find from the evidence in this case there existed an agreement or understanding between the defendant Leon Williams, and Josh Cartwright, George Baker and Reuben Bobbitts, or any of them, to aid and assist each other in the commission of the crime mentioned in the indictment and in the evidence (if you find from the evidence that such crime was committed), and further find from the evidence in this case beyond a reasonable doubt that, while in the pursuance and execution of such common purpose (if you find there was a common purpose), the said Leon Williams in the city of St. Louis aforesaid on December 30, 1923, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought shot with a pistol, and, by such shooting killed Harry Leonard, or was then and there present aiding, abetting or assisting, or was present for the purpose of aiding, abetting or assisting, others or another in the commission of such crime, then you will find Leon Williams guilty of murder in the first degree and assess his punishment as directed in the previous instructions; and unless you so find, you will acquit the defendant.''

The objections urged to these instructions are that they relate to the same subject-matter; that Instruction Number One is but a detached portion of Instruction Number Five, and that if authority existed for the giving of these instructions they should have been given together and not separately.; that as thus given, they singled out and gave undue prominence to certain portions of the testimony; and that they are not supported by the evidence; that Instruction Number One assumes everything

and requires a finding of nothing. These objections may be considered in the order in which they are made. Neither their form nor subject-matter is objected to. That they were given separately can constitute no objection to their propriety as they were neither inconsistent nor contradictory and were, as we will presently show, authorized by the evidence. Number One is general in its terms and definitive in its character. It correctly defines the law as to the degree of culpability of persons jointly charged with crime who are shown to have acted in its commission with a common intent. It is not necessary for an instruction of this nature to require a finding; explicit directions in this regard appear in other instructions. This is all that is required. While it is essential to their correctness that instructions shall be clear, present a harmonious whole and be supported by the evidence, it is not necessary that each should contain a finding or declare the limit of the punishment. If the rule were otherwise the well recognized canon of interpretation that all instructions must be read and construed together would lose its meaning. Furthermore, this instruction being purely definitive assumes nothing, nor can it be said to do so under the most strained construction. The case, State ex rel. Welch v. Morrison, 244 Mo. 193, cited by appellant to sustain this objection, has no possible application thereto. It was a suit upon an executor's bond. Aside from its general holdings that an instruction must not assume a disputed fact and that it must be within the purview of the pleadings and the evidence, neither of which shortcomings are found in these instructions, it is held that instructions must not assume the truth of an issue in controversy. The terms of these instructions lend no countenance to the contention that they contain this defect. Nor are these instructions subject to the criticism that they are mere abstract statements of the law. Read together they concretely state the facts concerning the killing, as detailed in the testimony of which appellant's confession forms a part. The jury are told no more than if they believe the facts, as

thus shown to be true, they may find the appellant guilty. The assumption of the appellant that the sole issue was the question as to the killing of Harry Leonard by the appellant is not correct. That this was the general or dominant issue is true, but, it was not the only one. Each relevant fact necessary to establish the general issue affirmed by the State and denied by the appellant was in the nature of a special or subordinate issue, and it was not improper for the trial court in the instructions to define the duty of the jury in determining the guilt of the appellant, if they found and believed the facts in evidence concerning his participation with others in the commission of the homicide, as these facts constituted special and subordinate issues in the case. Concretely stated, the proof of the participation of the appellant with others in the killing have been made, Instruction Number Five was necessary to enable the jury to intelligently determine the guilt or innocence of the appellant in the light of the facts therein stated. In so doing, the trial court did not violate the rule prohibiting a comment on the testimony. The instruction in its general terms has often received the approval of this court.

VIII.   It is insisted that error was committed in the refusal of the trial court to give appellant's Instruction G concerning the defense of an alibi.

Alibi.

An instruction, "Number Eight," on the rights of the appellant under this defense, was given at the request of the State. This instruction is as follows:

"8.   The defendant has interposed as a defense what is known in law as an alibi, that is, that even if the offense was committed, as charged, he was at the time of the commission thereof at another and different place than that in which such offense was committed, and, therefore, was not and could not have been the person who committed the same. Now, if the evidence leaves in your minds a reasonable doubt as to his presence at the place where the offense was committed at the time of the commission thereof, you will find him not guilty."

The objection made to this instruction is that it does not advise the jury as to the *quantum* of proof necessary to establish the defense of alibi. This instruction was given in connection with one on reasonable doubt and a presumption of innocence. Where this is the case an instruction on alibi which tells the jury, as this did, that if the evidence of this defense in connection with all of the other relevant facts, raised a reasonable doubt of the presence of the accused at the time and place of the crime, he should be given the benefit of such doubt and be acquitted, is not objectionable. The instruction given conforms to these requirements and limits the jury's consideration to the same rule as in the weighing of other testimony; but does not direct the jury as to a particular manner in which the evidence in support of this defense should be considered. Thus framed the State's instruction accords with the rule announced in many cases.

The instruction approved in State v. Hillebrand, 285 Mo. 1. c. 296, is, in all of its essential features, identical with the instruction here under review.

In State v. Bonner, 259 Mo. 1. c. 348, a capital case, in which the punishment was fixed at death, the defense of an alibi was interposed and the court instructed the jury thereon, in more meager terms than at bar, in these words: "The court instructs the jury that if there is any evidence before you that raises in your minds a reasonable doubt as to the presence of the defendant at the time and place where the crime is charged to have been committed (if you find a crime was committed) you will acquit the defendant." The complaint of counsel for the defense there, as here, was that the instruction should have more forcibly and definitely directed the attention of the jury to the evidence on the subject. This court held in the Bonner case that "the instruction was clear and complete and was, therefore, as definite and forcible as it was proper to make it." The cases cited follow the rule announced in many others determined by

this court, and the objection sought to be raised here may be said to be finally foreclosed.

It is further contended that the instruction on alibi asked should have been given as a converse instruction to that given at the request of the State. It is well in this connection to understand what is meant by a converse instruction. An illustration may serve a better purpose than a definition. When an instruction given at the request of the State embodies all of the essential elements of the crime charged and instructs the jury that if these be found and believed they may find the defendant guilty, the defendant is entitled to a converse instruction that if these essentials be not found they may find the defendant not guilty.

*Converse.*

That an alibi constituted the essential element of the appellant's defense, as we held in State v. Worten, 263 S. W. l. c. 126, is evident, but the instruction given for the State was in its terms, except as to the phraseology of its subject-matter, in full conformity with that asked by the appellant, in that it authorized the jury if they found and believed the evidence of an alibi they would acquit the appellant. At the instance of the State therefore the appellant received the benefit of such an instruction as he now contends was not given to him. This being true the statute (Sec. 4025, R. S. 1919) requiring trial courts to instruct juries upon all questions of law arising in cases necessary for their information in giving their verdicts, was fully complied with, especially as to the defense of an alibi, being in its language as to the finding authorized, identical with an instruction on that subject had it been given at the instance of the appellant.

In the Worten case we reviewed with some degree of care the later cases in this jurisdiction on the subject of an alibi, and they will be found to sustain the conclusion reached herein.

IX. Appellant complains of the refusal of the trial court to give instructions asked by him designated as "C" and "D".

The first defines the manner in which the jury is to consider the testimony concerning the appellant's admissions and statements as proofs of the crime; and the second instructs them as to the weight and credibility to be given to such statements and admissions.

**Instructions: Admissions and Credibility.**

·An instruction given at the request of the State fully and correctly advised the jury as to their duty in regard to this character of evidence. This instruction is in the form many times approved by this court and further discussion of same other than the citation of some of the cases in relation thereto is deemed unnecessary. [State v. Hamilton, 263 S. W. (Mo.) 1. c. 131, and cases there cited; State v. Simenson, 263 Mo. 1. c. 266; State v. McCleave, 256 S. W. (Mo.) 814.]

X.    Instruction Number Nine, given at the request of the State, defined the limits of a presumption of innocence; that the burden of establishing guilt rests upon the State; what constitutes a reasonable doubt; the manner in which the good character of the appellant was to be considered and the province of the jury as to the credibility of the witnesses and the manner in which their testimony was to be weighed.

**Falsus in Uno.**

The portion of said instruction to which objection is made has reference to the limit of the jury's province in the rejection of a witness's testimony. It is as follows:

"In this connection you are further instructed that if you believe that any witness has knowingly sworn falsely to any material fact, you are at liberty to reject the portion of such witness's testimony you may believe to be false."

The usual form of the instruction on this subject, often approved by this court, is as follows: "If you believe and find from the evidence that any witness has wilfully sworn falsely to any material fact in controversy, you are at liberty to reject any portion or all of said witness's testimony."

The form of the instruction given in the case at bar was under review in State v. Wicker, 222 S. W. 1014, and met with our approval on the ground that the limitation of the jury's power to the rejection of false testimony alone, instead of telling them that they might reject any or all of a witness's testimony, if they found any of same to be false, was held not to be error.

The reason therefor may be stated to be that the giving of this character of an instruction is discretionary with the trial court, dependent upon the facts in each particular case, and unless it appears that such discretion has been abused to the injury of the defendant, its exercise will not be interfered with. [State v. Hayes, 262 S. W. (Mo.) 1034; State v. Barnes, 274 Mo. l. c. 631; State v. Hickam, 95 Mo. 322; White v. Maxcy, 64 Mo. 552.] While the trial court, therefore, in the exercise of its discretion, under the facts at bar, might have properly told the jury that they were authorized, if they found any of a witness's testimony to be false, to reject all of same, it did not do so, but limited the jury's power to the rejection of false testimony. Instead of this being injurious to the defendant it was otherwise, in that it gave him the benefit of all of his testimony not found to be false. We therefore dismiss this contention from further serious consideration.

XI. The remarks of the attorney for the State in his argument to the jury are assigned as error.

A review of these assignments justifies their characterization as finical. They are, in the main, deductions in the argument of counsel for the State, drawn from the testimony; as such, unless it clearly appears, as it does not when fairly construed, that they were prejudicial to the appellant they will not constitute grounds for reversal. The trial court in ruling upon the objection of counsel to these remarks, in a majority of the instances, sustained the same. While the court did not, in sustaining the objections, rebuke the State's counsel as was requested, the rulings of the court carried with them a re-

buke as much so as if expressed in exact words to that effect. In addition, two instructions, designated as Numbers Ten and Eleven, were given, defining the duty of the jury in regard to objections of this character. They are as follows:

"10. You are further instructed that remarks made by counsel on either side during the argument of any question before the court are addressed to the court only and should have no influence whatever upon the jurors in the consideration of their verdict. Remarks of counsel for the State or for the defendant addressed to the court or addressed to each other are not evidence and are not to be considered as evidence by the jurors.

"You will also, in arriving at a verdict, disregard all questions directed by counsel to witnesses to which the court has sustained objections and all testimony of witnesses objected to and to which the court has sustained objections and also all testimony which the court has ordered stricken out of the record.

"11. The argument of counsel is for the purpose of aiding you to reach a proper verdict in the cause by refreshing in your mind the evidence which has been given to you in this cause, and by showing the application of the law thereto; but whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberations by the evidence as you understand it and remember it to be, and by the law as given by the court in these instructions, and render such verdict as in your conscience and reason and candid judgment seems to be just and proper."

The non-prejudicial character of the remarks in question probably rendered the giving of these instructions unnecessary; but having been given they cannot be construed as otherwise than beneficial to the appellant; they clearly defined the duty of the jury and limited their deliberations in the finding of their verdict to the facts in evidence. Of this the appellant cannot complain. In addition, they were expressly directed to disregard remarks of counsel. Thus guided, unless we presume

that the jurors lacked ordinary intelligence or were un-mindful of their oath, they were not influenced by the re-marks in question.

This murder was as ruthless as any which blackens the annals of crime. The impelling cause of its commis-sion was purely sordid. No pretense is made that it was the result of passion suddenly aroused or to satisfy a spirit of revenge. The appellant, when those associated with him in the attempted robbery fled from the scene, de-liberately shot and killed Leonard, who at the time, prob-ably paralyzed with fright, was offering no resistance. No effort was made to introduce any palliating circum-stances in the appellant's defense. There were none. Reliance for a reversal was based wholly upon errors claimed to have been committed during the trial. The record discloses none which warrant a reversal.

The judgment of the trial court is affirmed. All concur.