**STATE of Missouri, Respondent,**

v.

**Sidney B. ROWLETT, Appellant.**

**No. 57760.**

Supreme Court of Missouri, Division No. 1.

Dec. 10, 1973.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 14, 1974.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Lawrence W. Borschert, St. Charles, John G. Brunner, Evansville, for appellant.

WELBORN, Commissioner.

Appeal from judgment of conviction and sentence to life imprisonment, entered on jury verdict finding Sidney B. Rowlett guilty of murder in the first degree.

In June, 1969, Sidney B. Rowlett stopped by a tavern owned and operated by Mrs. Janet Pund. The tavern, known as Pund's Cozy Corner, was located three miles north of Wentzville, at the junction of Routes 61 and P. Rowlett told Mrs. Pund he was "Sid from Evansville" and that if she ever needed any drugs to give him a call. In September 1969, Mrs. Pund placed a call to Rowlett in Evansville, Indiana, and told him that she had a friend who wanted a large amount of amphetamines and asked if he could bring them in. On September 19, Rowlett appeared at Mrs. Pund's tavern. Robert Bussen who assisted Mrs. Pund in the operation of the tavern was there. William Rutledge came in and Mrs. Pund told him that "this was the gentleman that brought his merchandise to him." Rowlett got up to leave and asked Bussen to follow him. Bussen did so and returned alone. He and Rutledge went to Bussen's auto to deliver drugs to Rutledge. At that point FBI agents appeared and Bussen and Mrs. Pund were placed under arrest. Rowlett was arrested at his motel. The three were charged with violation of federal drug laws. While the three were in custody, Rowlett remarked to Mrs. Pund that "the only way anybody could harm him was someone had to see him handle them and Jitters (Bussen) was the only one that seen him handle them." A few days later, after the three had been released on bond, Rowlett came by the Pund tavern when Bussen was tending bar. Mrs. Pund heard Rowlett say that "it wouldn't be very healthy if anyone decided to try to make any statements or to testify against him."

Rowlett's trial on the federal charge was set for Monday, December 1, 1969. On the preceding Wednesday, Mrs. Pund and Bussen consulted with the United States attorney and were to testify against Rowlett.

At around 1:00 P.M. on Saturday, November 29, a stranger appeared at Mrs. Pund's tavern. He was friendly and introduced himself as Paul Clarkson or Claussen and said he was traveling from Florida to Kansas City. Mrs. Pund picked up his jacket and noted that "it was awfully heavy." Paul asked Mrs. Pund where there were some bright spots with more activity. Mrs. Pund said she was going to Wentzville and there were two taverns there where there were a lot of people. Paul went to Wentzville with Mrs. Pund and they were in Sexton's Lounge from about 2:00 to 5:00 P.M. Mrs. Pund noticed that Paul made a telephone call which she thought was "odd beings he was a stranger in town." From Sexton's Mrs. Pund and Paul, then joined by Mrs. Pund's daughter, went to the Spanish Inn in O'Fallon. They stayed there until around 7:00 P.M. and then returned to the Pund tavern. At around 9:00 P.M. Mrs. Pund took Paul into Wentzville and they returned to the Pund tavern at around 10:30. After a short stay, Paul left, saying he was going to get a motel room. He returned in about half an hour saying he had decided not to get a room. Mrs. Pund went to work tending bar at her tavern. Bussen who had been working went into the living quarters at the rear of the tavern and lay down. Mrs. Pund closed the tavern at 1:15. At that time Bussen and Paul were both asleep in the rear of the tavern. Mrs. Pund woke Bussen and asked him to take care of a customer who remained on the premises. Mrs. Pund left and went to Wentzville.

When she returned at approximately 2:30 P.M., Paul's car was gone and Bussen was not on the premises.

At around 2:00 P.M. on Sunday, November 30, Bussen's body was found in a field near Route P. He had been killed by a gunshot in the head.

At some date which does not appear from the transcript here, Paul, by then identified by his real name as William Lewis Herron, took a St. Charles County deputy sheriff to a place near the junction of Routes 40–61 and 94, where the deputy found a Japanese make .38 caliber revolver. Ballistic tests showed that the weapon had been used to fire the bullet found in Bussen's head.

Prior to the events here involved, Herron had lived with Peggy Powell for about a year. They spent Thanksgiving Day, November 27, 1969, at a motel in Chattanooga, Tennessee. That afternoon, they drove to Henderson, Kentucky and stopped at the Gateway Motel. Herron told Peggy he wanted her to meet a friend of his and he called Sidney Rowlett in Evansville, Indiana, some 12 miles away. Rowlett, his wife and baby came to the Gateway Motel. Herron and Rowlett had some drinks. They were alone a short time when the women went out for some cokes. The next day, Mrs. Rowlett took Peggy to get her hair fixed and she spent the night with the Rowletts. Just where Herron spent the night is not clear, but he and Peggy left the next day, which would have been November 29.

The pistol which had been recovered by St. Charles County authorities was traced to William Robey of Evansville, Indiana. Robey testified that in late September or early October, 1969, he had traded a Japanese make .38 caliber revolver, the only weapon of that type he ever owned, to Rowlett for a .32 caliber automatic. He had arranged the deal with Rowlett, but actually delivered the weapon to Rowlett's wife and received the .32 in exchange from her.

Mrs. Pund was arrested and charged with murder in Bussen's death, but she was released. Just when Herron was arrested does not appear. On March 14, 1971, Herron pleaded guilty to a charge of first de-

gree murder in Bussen's death and was sentenced to life imprisonment.

The state's theory of the charge against Rowlett was that he acted in concert with Herron to kill Bussen. The state's position was that Herron did the killing. It acknowledged the lack of evidence that Rowlett was present at such occurrence and that he was probably elsewhere.

█ The evidence was sufficient to make a case of Rowlett's guilt. The circumstances of motive, threat, association with the actual killer and connection with the murder weapon, considered in combination, were sufficient to meet the burden imposed upon the state.

The state's evidence showed that Rowlett believed that Bussen was the only person who could actually connect Rowlett with the federal narcotics charge. Rowlett spoke a threat against anyone who might testify against him. The death occurred just shortly before Rowlett was to be tried on the charges.

Appellant emphasizes that there was no evidence that he knew that Bussen and Mrs. Pund planned to testify against him. There was no such evidence, but Rowlett's earlier expression of his analysis of Bussen's role in a successful prosecution of Rowlett adequately establishes that Rowlett was acutely aware of the essential nature of Bussen's cooperation with the prosecution.

Herron's appearance, using an assumed name, in Wentzville, only two days before the trial setting and immediately following a visit with Rowlett, was certainly no coincidence.

Given Herron's connection with the death of Bussen, the circumstances from which Rowlett's participation through the agency of Herron could be inferred were sufficiently established to allow submission to the jury of Rowlett's guilt.

Inasmush as determination of a question such as this depends upon the facts of the particular case, no good purpose would be served by here detailing consideration of the authorities cited by appellant on this issue. The only homicide case cited by appellant, State v. Frisby, 204 S.W. 3 (Mo. 1918), involved circumstances far less indicative of guilt than those of this case.

█ Appellant contends that the trial court erred in admitting into evidence the record of Herron's plea of guilty in the Cole County Circuit Court to killing Bussen. Herron was called as a witness for the state. He gave his name and stated that he resided at the Missouri State Penitentiary. He refused to answer further questions on the ground of self-incrimination. Herron was asked whether or not he pleaded guilty to a charge of murder in the first degree in the death of Bussen. The trial court rejected the witness's claim of privilege against self-incrimination and directed the witness to answer the question. The witness persisted in his refusal to answer that and all other questions propounded to him. Over objection of defense counsel, based upon the hearsay rule and denial of the right of cross-examination, the court permitted the state to read in evidence the information filed in St. Charles County charging Herron with first degree murder in Bussen's death and that the information was the basis of Cause No. 6730 in the Cole County Circuit Court. The court permitted to be read from the transcript of proceedings on March 16, 1971, in the Cole County Circuit Court, the following:

"THE COURT: Herron, do you enter your plea of guilty to murder in the first degree as charged in the Information in Case No. 6730?

"DEFENDANT HERRON: Yes, sir, Your Honor."

The court also permitted to be read to the jury a portion of the judgment in the Cole County Circuit Court in Case No. 6730 which showed Herron's plea of guilty.

The appellant here relies upon the protection of the federal constitution, as well

as that of the State of Missouri. The United States Supreme Court has held that "the Sixth Amendment's right of an accused to confront the witnesses against him is * * * a fundamental right * * * made obligatory on the States by the Fourteenth Amendment." Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). Were the court at liberty to determine the admissibility of the evidence here in question without constraint of prior decision of the United States Supreme Court, the state's contention that the evidence amounted to proof of a prior statement against penal interest, and was thus fully within a recognized exception to the hearsay rule and did not offend the constitutional guaranty of the right of confrontation, might well be persuasive. See Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L. Ed.2d 297 (1973) (Preliminary Print). However, none of such recent cases appears to have placed in question the earlier decision of the United States Supreme Court in Kirby v. United States, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890 (1899), relied upon by appellant, and controlling of the question here presented.

Kirby was charged with receiving stamps stolen from a post office. A statute provided that a judgment of conviction of the person who stole the stamps should be "conclusive evidence" against the receiver that the stamps had been stolen. On Kirby's trial, the government introduced the record of the conviction upon trial of one of the three alleged thieves and pleas of guilty of the other two. The trial court instructed the jury that such evidence was prima facie evidence that the stamps had been stolen. In reversing the conviction, the court held the statute relative to the effect of the record of conviction of the thieves unconstitutional. The court stated (174 U.S. 54–55, 19 S.Ct. 576–577):

"We are of the opinion that the trial court erred in admitting in evidence the record of the convictions of Wallace, Baxter and King, and then in its charge saying that, in the absence of proof to the contrary, the fact that the property was stolen from the United States was sufficiently established against Kirby by the mere production of the record showing the conviction of the principal felons. Where the statute makes the conviction of the principal thief a condition precedent to the trial and punishment of a receiver of the stolen property, the record of the trial of the former would be evidence in the prosecution against the receiver to show that the principal felon had been convicted; for a fact of that nature could only be established by a record. The record of the conviction of the principals could not however be used to establish, against the alleged receiver, charged with the commission of another and substantive crime, the essential fact that the property alleged to have been feloniously received by him was actually stolen from the United States. Kirby was not present when Wallace and Baxter confessed their crime by pleas of guilty, nor when King was proved to be guilty by witnesses who personally testified before the jury. Nor was Kirby entitled of right to participate in the trial of the principal felons. If present at that trial he would not have been permitted to examine Wallace and Baxter upon their pleas of guilty, nor cross-examine the witnesses introduced against King, nor introduce witnesses to prove that they were not in fact guilty of the offence charged against them. If he had sought to do either of those things— even upon the ground that the conviction of the principal felons might be taken as establishing *prima facie* a vital fact in the separate prosecution against himself as the receiver of the property—the court would have informed him that he was not being tried, and could not be permitted in any wise to interfere with the trial of the principal felons. And yet the court below instructed the jury that the conviction of the principal felons upon an indictment against them alone was sufficient *prima facie* to show, as against Kirby, indicted for anoth-

er offence, the existence of the fact that the property was stolen—a fact which, it is conceded, the United States was bound to establish beyond a reasonable doubt in order to obtain a verdict of guilty against him.

"One of the fundamental guarantees of life and liberty is found in the sixth amendment of the constitution of the United States, which provides that 'in all criminal prosecutions the accused shall . . . be confronted with the witnesses against him.' Instead of confronting Kirby with witnesses to establish the vital fact that the property alleged to have been received by him had been stolen from the United States, he was confronted only with the record of another criminal prosecution, with which he had no connection, and the evidence in which was not given in his presence. The record showing the result of the trial of the principal felons was undoubtedly evidence, as against *them,* in respect of every fact essential to show *their* guilt. But a fact which can be primarily established only by witnesses cannot be proved against an accused, charged with a different offence for which he may be convicted without reference to the principal offender, except by witnesses who confront him at the trial upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases."

The court further stated (174 U.S. 60–61, 19 S.Ct. 579) :

"The principle to be deduced from these authorities is in harmony with the view that one accused of having received stolen goods with intent to convert them to his own use, knowing at the time that they were stolen, is not within the meaning of the constitution, confronted with the witnesses against him, when the fact that the goods were stolen is established simply by the record of another criminal case, with which the accused had no connection, and

in which he was not entitled to be represented by counsel. As heretofore stated, the crime charged against Wallace, Baxter, and King, and the crime charged against Kirby, were wholly distinct, none the less so because in each case it was essential that the government should prove that the property described was actually stolen. The record of the proof of a vital fact in one prosecution could not be taken as proof in the other of the existence of the same fact. The difficulty was not met when the trial court failed, as required by the act of 1875, to instruct the jury that the record of the conviction of the principal felons was conclusive evidence of the fact that the property had been actually stolen, but merely said that such record made a *prima facie* case as to such fact. The fundamental error in the trial below was to admit in evidence the record of the conviction of the principal felons as competent proof for any purpose. That those persons had been convicted was a fact not necessary to be established in the case against the alleged receiver; for, under the statute, he could be prosecuted even if the principal felons had not been tried or indicted. As already stated, the effect of the charge was to enable the government to put the accused, although shielded by the presumption of innocence, upon the defensive, as to a vital fact involved in the charge against him, by simply producing the record of the conviction of other parties of a wholly different offence, with which the accused had no connection.

"It is scarcely necessary to say that, to the rule that an accused is entitled to be confronted with witnesses against him, the admission of dying declarations is an exception which arises from the necessity of the case. This exception was well established before the adoption of the constitution, and was not intended to be abrogated. The ground upon which such exception rests is that, from the circumstances under which dying declarations are made, they are equivalent to the evidence of a living witness upon oath; 'the condition of the

party who made them being such that every motive to falsehood must be supposed to have been silenced, and the mind to be impelled by the most powerful considerations to tell the truth.' Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L.Ed. 917; Cooley's Const. Lim. 318; 1 Phillips on Ev. c. 7, § 6."

The application of the Kirby case has apparently not been before this court previously. However, in other jurisdictions the rule there laid down has been followed. See Commonwealth v. Tilley, 327 Mass. 540, 99 N.E.2d 749, 754 (1951); State v. Fox, 12 N.J. Super. 132, 79 A.2d 76 (1951); State v. Jackson, 47 N.M. 415, 143 P.2d 875 (1943); State v. Jackson, 270 N.C. 773, 155 S.E.2d 236 (1967).

There are cases which have reached a contrary result, but which did not consider *Kirby*. See: Powers v. State, 174 Ga. 202, 162 S.E. 275, 276[1–3] (1932); Jones v. State, 108 Ark. 447, 158 S.W. 132 (1913); Colosacco v. United States, 196 F.2d 165, 167[3, 4] (10th Cir.1952); Havener v. United States, 15 F.2d 503 (8th Cir.1926); State v. Stewart, 85 Kansas 404, 116 P. 489 (1911).

In Dutton v. Evans, supra, Mr. Justice Harlan, in an unsupported concurring opinion, advanced the proposition that the result in Kirby was premised upon the law of judgments, not the right of confrontation. 400 U.S. 98, 91 S.Ct. 210, 27 L.Ed.2d 213. He cited 4 Wigmore, Evidence, § 1079, p. 133 (3rd Ed.1940) in support of this proposition. This unsupported opinion cannot provide the basis for the rejection of the rule laid down in Kirby. See Rule 803(22), Federal Rules of Evidence and Advisory Committee's Note, 93 S.Ct. No. 5(Adv.), p. 114 (1973).

The state has not answered the contention of appellant, based upon Kirby. The state's brief merely states that the evidence here meets the test specified by Kirby, apparently referring to the portion of Kirby which explains the exception for dying declarations on the basis of the circum-stances in which they are made. 174 U.S. 61, 19 S.Ct. 574. However, the state has ignored the fact that the evidence here involved was not a dying declaration, but was of the exact caliber of the evidence found objectionable in Kirby.

The admission into evidence of the record and judgment of Herron's plea of guilty was error which requires reversal of the judgment. Because questions concerning them may arise upon retrial, two further contentions of appellant will be considered.

■ Appellant contends that the trial court erred in admitting into evidence the pistol shown to have been used in Bussen's death. Appellant contends that the detective who discovered the weapon testified that he did so after questioning Herron, who led him to the weapon. Appellant contends that Herron's refusal to testify deprived him of the right to cross-examine Herron, in violation of constitutional guarantee of right of confrontation of witnesses. Appellant contends that the weapon was produced as the result of the acts of a co-conspirator after the common enterprise had ended. The appellant equates the testimony of the officer to testimony to a post-conspiracy declaration, held inadmissible in such cases as State v. Chernick, 278 S.W.2d 741 (Mo.1955), and State v. Newell, 462 S.W.2d 794 (Mo.1971). The principles laid down by those cases are not subject to question. The problem here is whether the principles are applicable.

The officer testified to no declaration by Herron. He did testify that Herron showed him where the gun could be found. There is no intimation whatsoever in the officer's testimony that Herron made, in the course of the declaration, a statement implicating appellant. At most, the inference would be that Herron told the officer "I threw a gun with which I shot Bussen at such a location." Such a declaration, in the circumstances here, would have been admissible as a declaration against penal interest, which would not have offended

the constitutional guarantee relied upon. Dutton v. Evans, supra; Chambers v. Mississippi, supra.

■ Appellant contends that the trial court erred in refusing to sustain his motion to discharge because of delay in bringing him to trial. Appellant cited §§ 545.-890 and 545.920, RSMo 1969, V.A.M.S., in support of this allegation, but has not demonstrated their applicability in this case. The only authorities cited on this point in his Points and Authorities are cases which have applied the federal constitution (Amendments VI and XIV), to-wit: Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), and Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Appellant makes no effort to demonstrate the applicability to this case of those cases, all of which involved delays of much greater length than that here presented. According to appellant's motion, he had been arrested on December 1, 1969. His motion for discharge was filed May 5, 1971 and overruled June 30, 1971. Trial began August 23, 1971. There was no allegation or proof that appellant had been prejudiced by the delay or that the delay involved purposeful or deliberately oppressive actions by the state prosecuting officials. In these circumstances, appellant has demonstrated no delay which gives rise to a claim based upon federal constitutional guaranties. Lillibridge v. Swenson, 326 F.Supp. 1104 (W.D.Mo.1971); United States v. DeLeo, 422 F.2d 487 (1st Cir. 1970).

Other claims of error advanced on the appeal need not arise upon a new trial and do not require consideration on this appeal.

Reversed and remanded.

Higgins, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.