STATE of Missouri, Respondent,

v.

Emmett F. DUNN, Appellant.

No. WD 37728.

Missouri Court of Appeals,
Western District.

April 14, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1987.

Application to Transfer Denied
July 14, 1987.

Kathleen Murphy Markie, Columbia, for appellant.

William L. Webster, Atty. Gen., Lee A. Bonine, Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, J.P., and PRITCHARD and DIXON, JJ.

PER CURIAM:

Defendant appeals from his jury convictions of two counts of capital murder, § 565.001, RSMo 1978, and sentences to two consecutive life terms of imprisonment without eligibility of parole for 50 years.

On appeal, defendant claims the trial court erred in prohibiting him from questioning a defense witness about certain letters the witness had written defendant and in finding that two child witnesses, ages six and ten at the time of trial, were competent to testify.

On February 28, 1984, the police were called to Troost Lake in Kansas City, Missouri. When the police arrived they discovered a car partially submerged in the lake. When the car was pulled from the lake, the bodies of Diane Rivers and Harold James were discovered lying on the floorboard of the back seat. Rivers's son, nine-year-old Reginald (Reggie) Rivers, was lying on top of the bodies in a semiconscious state with ligature marks on his neck. Rivers's daughter, five-year-old Telia Dunn, was found on the shoreline. She also had ligature marks on her neck but was otherwise in good condition.

Testimony at trial revealed that on February 27, 1984, James and Rivers and the children went to visit defendant and Shirley Atkins. Defendant, Atkins, James and Diane Rivers were drinking and smoking marijuana. James became drunk and fell to the floor, and Diane Rivers asked defendant to help her put James in the car. An argument ensued with some pushing and shoving. Shirley Atkins threw Diane Rivers to the floor. James grabbed at Atkins's leg and Atkins stabbed James. Defendant got a shotgun and hit James in the stomach with the gun, then shot him. Defendant turned a handgun on Atkins and

ordered her to shoot Diane Rivers with the shotgun. Atkins did shoot Rivers. Defendant instructed Atkins's son, James Earl Rivers, to shoot Diane Rivers and he also shot her with the shotgun. Defendant shot Diane Rivers in the back with the handgun. Defendant next choked Reggie with a chain until Reggie lost consciousness, and then defendant unsuccessfully tried to choke Telia.

James Earl Rivers and defendant placed the bodies in the car. Atkins drove the car with the two dead bodies and the two children into Troost Lake. After Atkins had left the house with the bodies, Atkins's daughters attempted to clean the blood off the carpet as instructed by defendant. Later, the carpet was pulled up and placed in the basement. The shotgun, handgun and chain were thrown over a bridge at Little Blue River. Defendant and Atkins were arrested February 28, 1984. Atkins made a plea bargain with the state in which she agreed to tell the complete truth in exchange for a reduction of her charges to manslaughter.

In his first point on appeal, defendant claims the trial court erred in prohibiting defense counsel from questioning defense witness Shirley Atkins about information contained in certain letters written by Atkins to defendant. Defendant argues that the majority of the state's case rested on the testimonies of Atkins and her daughters. He claims his proposed inquiries were proper as impeachment and would have elicited direct evidence of lack of fear on the part of Atkins and her daughters and would have demonstrated Atkins's motive to lie.

The state endorsed Atkins but did not call her to testify. Defendant requested that he be allowed to call Atkins as an adverse witness. After a considerable amount of discussion, the court replied that "unless and until it's developed on ... [your] direct examination [of her] ..., that she is hostile, you will not be permitted to lead or cross-examine the witness or impeach her."

On direct, defense counsel asked Atkins about her plea bargain with the state. Defense counsel then asked Atkins various questions about the night of the murders but he did not ask Atkins anything about her relationship with defendant. The prosecutor cross-examined Atkins extensively about the night of the murders, and asked her several questions concerning the terms of the plea bargain.

Defense counsel called two other witnesses to the stand, then approached the court about recalling Atkins for more redirect questioning. Specifically, defense counsel asked "to bring her back to ask her redirect examination questions concerning letters she had written Emmett Dunn, contrary to the things she said to [the prosecutor]." The defense was allowed to bring Atkins back to the courtroom but she refused to testify without her attorney being present.

Subsequent discussions between the court and defense counsel concerning Atkins's letters went as follows:

THE COURT: Again, maybe you could re-address that issue as to the purpose, what you are trying to prove by these letters.

[DEFENSE COUNSEL]: Judge, what I am coming back to, again, is what, in all honesty with the Court, and the Court has already told me that I could not do that, and so I am just re-addressing the issue again. Through the letters, I would be impeaching Shirley Atkins and the things she just said in cross-examination, through those letters.

THE COURT: Can you be more specific as to how these letters impeach her?

[DEFENSE COUNSEL]: Yes, sir. Specifically, one of the letters refers to her telling this story to the police because they wrote it down that way and told her to say it that way.

THE COURT: And she does not indicate in the letter any of those facts, she merely states, "I told the police a story that was a lie"?

[DEFENSE COUNSEL]: Yes, sir. And I can show you that to make an offer of proof of that letter, if I may.

The offer of proof was allowed. Defense counsel read portions of the letters in question to the court. In each of the letters, Atkins proclaimed her love for defendant. In a few of the letters Atkins questioned defendant about his interest in someone else but even those letters are affectionate in nature. In other letters, Atkins asked defendant what she should do. One letter contained the statement, "I'am [sic] sorry the way I acted in court but that was what I was told to do baby...." In another letter, Atkins stated:

> I have not, seen nor have I talked, to anybody, from day one, just my lawyer, I'am [sic] not going to plead guilty, and I told, my lawyer, I do not want, to testify against you. And I did'nt [sic] denied [sic] your statements, I have not, even seen are [sic] heard of, your statements until now. Baby, I'am [sic] trying to, get ready for all of this. And I did not lie, on you Baby, they wrote, all that s—— up, the way they wanted too [sic]. Because I did'nt [sic] have a lawyer there to defend me, like I should haved [sic]. I'am [sic] sorry for talking, without one, if I had knew [sic], I would have said, anything that's late now.

The court overruled defense counsel's request to inquire about the letters. Two of the exhibits mentioned in the offer of proof are not included in the record on appeal.

Defendant first claims his proposed inquiries about the letters were proper for impeachment. The rule in Missouri was, for many years, that no party in either a civil or criminal case could impeach his own witness unless the witness was hostile. *See State v. Byrd*, 676 S.W.2d 494, 502 (Mo. banc), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1984). The rule was changed for civil cases in *Rowe v. Farmers Insurance Co.*, 699 S.W.2d 423, 425 (Mo. banc 1985), which held that "any party [may] introduce a prior inconsistent statement to impeach any witness regardless of by whom the witness may have been subpoenaed or called." This district has adopted the rationale of *Rowe* for crim-

inal cases as well in *State v. Moutray,* 728 S.W.2d 256 (Mo.App.1987).

In certain criminal cases a relatively new statute, effective two weeks prior to defendant's trial, also affects prior inconsistent statements. That statute reads as follows:

**491.074. Prior inconsistent statement may be admissible in certain cases as substantive evidence.**—Notwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of an offense under chapter 565, 566 or 568, RSMo, shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement.

RSMo 1986. The offenses for which defendant was tried fall under "offenses against the person," Chapter 565, RSMo. Section 491.074, therefore, is applicable; it pre-empts any law to the contrary and makes a prior inconsistent statement of *any* witness admissible as substantive evidence. If defendant was able to demonstrate to the trial judge that there were inconsistencies between the statements Atkins made at trial and those she made in her letters to defendant, he should have been allowed to put those inconsistencies before the jury as substantive evidence. The rationale of *Rowe* and the statute deal only with prior *inconsistent* statements. Whether an inconsistency exists between trial testimony and statements made prior to trial is to be determined by the whole impression and effect of what has been said and done. *State ex rel. State Highway Commission v. Fenix,* 311 S.W.2d 61, 64 (Mo.App.1958); *State v. Nimrod,* 484 S.W.2d 475, 478 (Mo.1972); *State v. Jones,* 629 S.W.2d 589, 591 (Mo.App.1981). "Isolated words or phrases contained in the testimony or an omission of detail supplied at trial will not suffice as a basis for the necessary contradiction." *Nimrod,* 484 S.W.2d at 478. Some real inconsistency must appear before evidence of alleged inconsistent statements becomes competent. *State v. Armbruster,* 641 S.W.2d 763, 767 (Mo.1982). In the use of the term *incon-sistent statements* the legislature is presumed to have had in mind the prior judicial definitions of "prior inconsistent statements."

No such inconsistency appears in this case. There is no testimony in the record which is contrary to the "whole impression and effect" of the statements made in the letters. Atkins never says in her letters that she lied to the police; in fact, she wrote to defendant that she "did not lie on [him]." She does say that she did what she was told to do and that "they" wrote all "that" up the way "they" wanted to. Not only are such statements too vague to show any real inconsistency with trial testimony, but when taken in context with the remainder of the letters, give the impression that Atkins would have lied on defendant's behalf had she learned of his statements in time. Atkins was never questioned at trial about her personal relationship with defendant, so nothing she says in the letters concerning her feelings about defendant is contrary to anything she said at trial.

Defendant also claims that he should have been allowed to use the letters as direct evidence that Atkins was jealous of defendant and therefore had a motive to lie against him and to show that neither Atkins nor her daughters were afraid of defendant.

The letters simply do not show what defendant claims they do. The letters are generally very affectionate in nature. In a couple of the later letters, Atkins questions defendant about his interest in another woman, but even in those letters Atkins professes her great love for defendant. The letters are not vindictive in nature. Moreover, defendant did not need the letters to ask Atkins about her relationship with defendant. He could have asked her about her personal relationship with defendant on direct examination but for some reason chose not to.

Regarding defendant's claim that the letters showed that neither Atkins nor her daughters feared him, defendant never establishes what relevance fear or lack of fear on the part of Atkins and her daugh-

ters has on the case. He makes no demonstration that a lack of fear gave them a motive to lie on the stand. The trial court did not err in prohibiting defense counsel from questioning Atkins about the letters.

In his second and third points, defendant challenges the use of the testimonies of Telia Dunn and Reggie Rivers at trial. He claims Telia was incompetent to testify at trial because she was only five years old at the time of the offenses and only six years old at trial, she was incapable of understanding the witness oath, and her impressions of the incidents charged were influenced by "authority figures."

Defendant claims Reggie was not competent to testify because Reggie was less than ten years old at the time of the offenses charged and due to his age and injuries at the time of the offenses, he was not capable of forming just and lasting impressions of what had occurred. Defendant argues Reggie's testimony was based upon information provided to him by Telia.

■ Regarding persons who are incompetent to testify, § 491.060(2), RSMo 1986, provides that "A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which he is examined, or of relating them truly" shall be incompetent to testify. While a child under ten years of age is presumed incompetent as a witness, the presumption is rebuttable. *State v. Smith*, 679 S.W.2d 899, 901 (Mo.App.1984). A young age alone is not enough to absolutely preclude a witness from testifying. *See C.R.K. v. H.J.K.*, 672 S.W.2d 696, 699 (Mo.App.1984). For a child under ten years of age to be adjudged competent to testify, he must exhibit: (1) present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the capacity to translate the occurrence into words. *State v. Johnson*, 694 S.W.2d 490, 491 (Mo.App.1985).

Defendant's claim that Telia did not understand her obligation to tell the truth is primarily based on Telia's affirmative answer to defense counsel's question, "If I promise to get you two big strawberry ice cream cones, would you say that I was there that night?" Defendant argues that Telia indicated she would lie for two strawberry ice cream cones. He fails to take into account the lack of clarity of the question and the interruption caused by the objection made by the state immediately after the question. On redirect, Telia stated she would not lie in exchange for ice cream or soda.

■ Determination of the testimonial competency of a child witness must rest upon the whole of his or her statements. Telia's answers on redirect examination and the balance of her testimony at the competency hearing and the trial adequately demonstrated that six-year-old Telia knew it was bad to tell a lie and good to tell the truth. She said that if she told a lie she would get in trouble with her grandma and her daddy. She goes to church and believes in God, and thought God would "strike her down" if she lied. Telia knew where she lived and whom she lived with, when her birthday was, where she attended school and who her doctor was. Her testimony about the night in question was *generally* consistent with the testimony from other witnesses regarding the same night. She answered willingly and fairly articulately. The transcript does not reveal any reason to believe that Telia's memory of the events were influenced by "authority figures" as defendant suggests. The trial court did not abuse its discretion in allowing Telia to testify.

As for Reggie, defendant claims that he was incompetent to testify because he was less than ten at the time of the occurrence about which he was questioned and because his injuries on the night of the incident rendered him incapable of forming "just and lasting" impressions of what occurred. Defendant points out that Reggie admitted that his sister Telia provided him with information about the night's events.

From the portion of § 491.060(2), which was quoted *supra* concerning competency of witnesses, it appears clear that the statute raises a presumption that a person who is ten years of age at the time of trial is competent to testify. Therefore, Reggie was presumed competent. That notwithstanding, Reggie demonstrated his competency at the hearing and at trial. Like Telia, Reggie knew his address, whom he lived with, his sisters' ages, his teacher's name, his grade in school, etc. He also demonstrated that he knew what it meant to tell the truth and to tell a lie, and he knew he would get in trouble with God if he lied. His recitation of the events of the night in question was *generally* consistent with the testimony of other witnesses. He admitted that he didn't know what happened as he was being strangled or afterwards except through Telia. He stated positively that he could discern between what Telia told him and what he remembered independently. When asked if Telia told him that the defendant had shot anybody, Reggie answered, "No. I saw that with my own eyes." The trial court was well within its discretion in adjudging Reggie competent to testify.

The trial court's judgment is affirmed.