STATE of Missouri, Plaintiff–
Respondent,

v.

Donnie L. BLANKENSHIP,
Defendant–Appellant.

Donnie L. BLANKENSHIP,
Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

No. 74239.

Supreme Court of Missouri,
En Banc.

April 21, 1992.

Rehearing Denied June 2, 1992.

Henry B. Robertson, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., John P. Pollard, Millie Aulbur, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

HOLSTEIN, Judge.

Defendant Donnie Blankenship was convicted by a jury and sentenced to life imprisonment for each of five counts of murder in the second degree, § 565.021,[1] thirty years for one count of robbery in the first degree, § 569.020, fifteen years for receiving stolen property, § 570.080, and ten years for unlawful use of a weapon, § 571.-030. All sentences were to be served consecutively. A motion for post-conviction relief under Rule 29.15 was filed but was overruled without hearing. The defendant's appeals in both cases were consolidated. Following opinion [2] by the Missouri Court of Appeals, Eastern District, this Court granted transfer. Rule 83.03. The judgments are affirmed.

## I.

At about 11:00 p.m. on September 4, 1987, two or more gunmen entered the National Supermarket on Natural Bridge Road in the City of St. Louis. Among those working in the store that evening were store manager Harold Meyers, security guard David Spahn, bagger Michael Mahr, office workers Richard Fortson and Rose Brown, stockman Mike Beam, janitor Kenneth Bass, and night crew supervisor Chris Hennicke.

The first gunman encountered by Meyers was a black male wearing gray jeans and a white short-sleeve pullover shirt without a collar. The shirt had buttons on the front and green and red markings on the top of both sleeves. The gunman appeared to be in his mid-twenties, about 5'10" in height and weighing about one hundred seventy-five pounds. The gunman also wore an earring post. As he entered Meyers' office, the gunman pointed a revolver at Meyers and ordered Meyers to open the safe. Meyers attempted to do so but was unsuccessful. The gunman then threatened to kill Meyers and struck Meyers in the head with the gun, splitting Meyers' head open. Mike Beam then made an unsuccessful attempt to open the safe. The gunman punched Beam in the face. At that point Rose Brown went to the safe and with some effort managed to get the combination to work and opened the safe. Meyers directed Brown to give the gunman a plastic National Supermarket bag. The gunman then placed money from the safe into the bag. The safe contained four or five thousand dollars in one dollar bills. The bills were in ten bundles of one hundred singles and were blocked together so as to form a brick and wrapped in cellophane. Also taken from the safe was Bi–State bus pass number 4300 good for the week beginning September 14, 1987.

At that point the gunman directed those in the office out into the store. There Meyers encountered Spahn and Bass seated on the floor. A second gunman was standing guard over them. The first gunman ordered Meyers, Bass, Brown, Spahn, Beam, Fortson and Mahr to lie down in line on the floor on their stomachs. Apparently one of the gunmen had relieved Spahn of his revolver. As the victims lay on the ground, shots were fired. The shooting stopped briefly. One of the gunmen removed spare bullets that Spahn kept in his shirt pocket. He apparently reloaded the gun and the shooting commenced again. The gunman went down the line of victims, shooting each in the back of the head. One of the guns used to shoot the victims was later identified as Spahn's. Of the seven, only Meyers and Fortson survived.

Even though Meyers had been struck in the head and shot twice, he remained conscious. After the firing ceased the second time, Meyers waited two or three minutes, feigning death. By that time the gunmen had fled the scene. He then got up and went to call the police.

Chris Hennicke and two other employees had been stocking shelves in another part

---

**1.** All references to statutes are to RSMo 1986 unless otherwise noted.

**2.** This opinion borrows heavily from that of Hon. Albert J. Stephan, Jr., written on behalf of the court of appeals prior to transfer.

of the store when they heard the first series of shots. Hennicke went to investigate and saw two men, one looking out toward the street and the other bent over the bodies of the victims. Hennicke rejoined the other two employees and the three went into a back room, where they heard the second series of shots fired. They then went through a trap door onto the store roof. From there they yelled to a woman in the street to call police.

At about midnight that night, Philip Harden went to the home of defendant's brother, James Blankenship. There he found defendant alone, drinking and listening to the radio. Defendant appeared nervous. He paced the floor, looking out the windows and door. While there, defendant showed Harden a gun. However, defendant did not say where he obtained it. Harden eventually left.

The following Monday or Tuesday, Harden gave defendant a ride from James Blankenship's house to the house of Leroy Blankenship, another brother of defendant. During the drive defendant ducked down in the seat when a police car was near. When asked what was wrong, defendant replied he had "f___ up, he was involved in a robbery and some people was killed." A few days later defendant loaned Harden $50. The $50 was all in one-dollar bills.

About a week after the robberies and murders, Marvin Jennings brought defendant to Leroy Blankenship's house. Defendant had a pistol and $1,100 in cash. The defendant told Leroy that Marvin Jennings was with defendant when he "robbed [a] dope house." The cash was all in one-dollar bills. Some of the bills were wrapped in stacks of $100 each. There were approximately ten of these stacks. They were wrapped in cellophane in the form of a brick. The bills were in a plastic bag bearing the markings of the National Supermarket. Defendant left the gun and the money at Leroy's house. Leroy later gave the gun to his uncle, Jimmie Kennedy.

In a conversation with defendant's brother, James, defendant related that he and Marvin Jennings had "cleared about $4,500 a piece [sic] from the murder and robbery."

In mid-September of 1987 defendant had the transmission of his car repaired. He paid a down payment of $50 in forty one-dollar bills and either two fives or one ten-dollar bill.

On November 8, 1987, police stopped a 1972 blue Ford Maverick for speeding in St. Louis county. A passenger in the vehicle was defendant's uncle, Jimmie Kennedy. During a search of the vehicle a revolver was found in the trunk. The gun was later identified as that taken from Spahn and used as a murder weapon. Kennedy told police that the previous September he had been given the gun by Leroy Blankenship after making arrangements to do so with defendant. Kennedy also told police that defendant said he wanted the gun back.

Shortly after that, Harden learned that the gun had been found by police. Harden and James Blankenship went looking for defendant. They located defendant at Leroy Blankenship's house. Defendant told Harden he wanted to leave town because the police had found the gun in Jimmie Kennedy's car. That night James Blankenship called his employer, Mary Gray, and told her that his uncle had been caught with "the guard's gun" from the National Supermarket robbery, and defendant needed money the employer had been holding for James.

Police arrested defendant on November 10, 1987. In response to defendant's question as to what he would be charged with, the officers told him the charge would be receiving stolen property. Defendant replied, "All I did was take the guard's gun and give it to my uncle." Defendant had a pierced ear at the time of his arrest. It was also disclosed that Marvin Jennings had worked as a cleaning man at the National Supermarket on Natural Bridge Road during the last week of August, 1987. On this evidence the defendant was found guilty of the five counts of murder and one count each of robbery, receiving stolen property, and unlawful use of a weapon. Other facts will be developed as necessary on each point discussed.

## II.

In his first point, defendant claims the trial court's exclusion of the out-of-court statements of Ricky Williams violated defendant's due process rights. Defendant claims that Williams' statements were declarations against penal interests bearing sufficient indicia of reliability to mandate their admission in evidence under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

At trial defendant called Ricky Williams to the witness stand. Williams claimed his privilege not to testify under the Fifth Amendment.[3] Defendant then offered to prove certain out-of-court statements made by Williams during a videotaped interview with police.[4] According to the offer of proof dictated into the record by defense counsel, Williams gave four interviews to police on the day following the murders. The length of the individual interviews and the time between interviews is not disclosed. Williams' first interview occurred at about noon on the day following the murders. Williams first told police that he had overheard information about the National Supermarket incident on a bus ride. In the second session, at about 3:00 p.m. that same day, police questioned Williams in more detail. Williams then said he knew the identity of the people involved in the National Store robbery. Williams named five people, including himself, but did not name defendant. Williams denied that he went inside the store and denied that he had any idea what the other people involved were going to do. He said he was wearing a security guard[5] uniform, which might have helped others gain access to the store. In a third interview conducted some time that same evening, Williams stated he went inside the store and was present when the shooting began. At that point

Williams claims to have run to leave the store. At the close of the third interview, Williams repudiated what he had said before and denied any involvement in the store robbery. In the fourth interview, which occurred late on the evening of September 5th or in the early hours of September 6th, Williams informed police that he had lied earlier and again repudiated any involvement in the incident. Defense counsel informed the court that she wished only to offer the third interview. The trial court rejected the offer of proof.

Apparently in an effort to bolster the reliability of the out-of-court statement, defense counsel offered portions of the depositions of officers who conducted Williams' interviews. The depositions reiterated part of what counsel said would be disclosed from the videotapes and indicated that Williams was not mistreated when the statements were taken. One of the officers also stated that Williams' statement seemed "to be consistent with the scene" where the crime was committed because Williams "knew basically the layout of the store ... he knew there was actually a shooting where some people were killed, he gave us information how the store routine works, he told us there was no alarm system to a point to activate the alarm to a holdup, just a general routine of the store."

Before *Chambers v. Mississippi*, Missouri courts had consistently held that declarations against the penal interests of an unavailable witness were not admissible as an exception to the hearsay rule in criminal proceedings. *Brown v. State*, 404 S.W.2d 179, 185 (Mo.1966); *State v. Williams*, 309 Mo. 155, 274 S.W. 427, 430 (1925); *State v. Hack*, 118 Mo. 92, 23 S.W. 1089, 1091 (1893); *State v. Evans*, 55 Mo. 460, 461 (Mo.1874).[6] That rule has not been mod-

---

**3.** A witness who refuses to testify pursuant to the Fifth Amendment privilege is unavailable for purposes of determining the admissibility of a declaration against interest. *Sutter v. Easterly*, 354 Mo. 282, 189 S.W.2d 284, 288–89 (1945).

**4.** The videotape is not part of the record on appeal.

**5.** Williams was employed by the same security guard company that employed Spahn. Appar-

ently the company had a contract to provide security for the National stores.

**6.** The rule in these cases has been criticized by authorities no less daunting than Justice Holmes and Professor Wigmore. *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 461, 57 L.Ed. 820 (1913) (Holmes dissenting); *Wigmore on Evidence*, (Chadbourn rev.) § 1477. Turning a blind eye to the Missouri cases cited above, the views of Holmes and Wigmore were

ified except to the extent required by *Chambers.* *State v. Turner,* 623 S.W.2d 4, 9 (Mo. banc 1981), *cert. denied* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982).

In *Chambers* the defendant, on trial for murder of a police officer, sought to introduce the testimony of three witnesses. Each witness claimed that shortly after the policeman was murdered, one Gable McDonald admitted to having killed the policeman with a weapon of the same caliber used in the killing. Prior to attempting to call those three witnesses, McDonald had been called by the defendant and admitted he had signed a confession to the murder, but repudiated the confession. When defense counsel sought to inquire of McDonald regarding the oral statements made to the three other witnesses just mentioned, the state objected to the defendant attempting to impeach its own witness. That objection was sustained. The United States Supreme Court noted that the statements of the three witnesses, if admitted and believed, would have exonerated the defendant and "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." 93 S.Ct. at 1048. The indicators of reliability identified by the United States Supreme Court were (1) each confession was "in a real sense self-incriminatory and unquestionably against interest," (2) each statement was spontaneously made to a close acquaintance shortly after the murder occurred, and (3) the statements were corroborated by other evidence in the case. *Id.* The court held that failure to admit the testimony regarding McDonald's extrajudicial confessions, coupled with the Mississippi rule that forbade the defendant from impeaching the trial testimony of McDonald, a defense witness, denied the defendant a fair trial in violation of the Due Process Clause. 93 S.Ct. at 1049. The United States Supreme Court took pains to note that it was not displacing the hearsay rule or creating any new exceptions. "Rather, we hold quite simply

that under the facts and circumstances of this case the rulings of the trial court deprived Chapman of a fair trial." 93 S.Ct. at 1049.

■ After *Chambers,* the first case to reach this Court involving a defendant's effort to introduce declarations against penal interests was *State v. Turner, supra.* Notwithstanding the unlikelihood that an innocent person would confess to crime, this Court cautioned against opening the door to extrajudicial confessions beyond the facts presented in *Chambers.* 623 S.W.2d at 9. The reason for such caution is that the uncorroborated out-of-court confession of an unavailable witness offered in a criminal case often occurs under circumstances that evoke suspicion as to its reliability. The criminal character of the declarant or the witness reinforced with the requirement that the declarant be unavailable make perjury easier to accomplish and more difficult to punish. *McCormick on Evidence,* § 318 (4th ed. 1992). The confessions of an unavailable witness travelling under the banner of declarations against interest are even considered untrustworthy in the more "liberal" jurisdictions that follow the federal rules of evidence. Under those rules, declarations against the penal interest of an unavailable witness are inadmissible unless "corroborating circumstances clearly indicate the trustworthiness of the statement." *Federal Rules of Evidence* 804(b)(3). By contrast, the federal rules have no prerequisite that extrajudicial declarations against the pecuniary or proprietary interest of an unavailable witness be corroborated.

From what has been said, it is apparent that the extrajudicial statement of Williams falls short of the admissibility standard established in *Chambers* for several reasons. First, a careful examination of the offer of proof discloses that Williams' statement was not "in a real sense self-incriminatory and against interest." Williams did not admit that he was one of

adopted by Missouri in civil cases. *Sutter v. Easterly,* 189 S.W.2d at 289–90 (the Court asserted that it had "not been able to find any Missouri authorities" to support the contention that

the declarations against interest exception to the hearsay rule was limited to declarations against pecuniary or proprietary interests.)

those who actually committed the robbery or the murders. So far as the offer of proof discloses, he did no more than admit to being present and knowing those involved in the crime. In order to find Williams' statement, as described in the offer of proof inculpatory requires several inferences. Even if Williams' alleged statement implicates him as an accessory, the portion of his statement suggesting his own complicity is distinguishable from that aspect of his statement in which he names the others who actually committed the crimes. The disserving aspect of Williams' statement is inconsequential. The only significant aspect of Williams' statement and the only purpose for which it was offered was to establish the identity of others who actually committed the crimes. The portion of the statement in which Williams named those who committed the actual robbery and murders is not against Williams' interest. That portion is either neutral or self-serving in nature. Thus, that aspect of Williams' statement does not bear the trustworthiness accorded a confession of his own involvement. To the extent the statement is not against interest, it is properly excludable as hearsay. *United States v. Porter*, 881 F.2d 878, 883 (10th cir.); *cert. denied*, 493 U.S. 944, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *United States v. Lilley*, 581 F.2d 182, 188 (8th cir.1978). At the same time, the incriminating aspect of Williams' statement does not exonerate the defendant. That alone is sufficient justification for rejecting Williams' "confession." 623 S.W.2d at 9.

The statement of Williams also was not made spontaneously to a close friend of Williams, as were the statements of McDonald in *Chambers*. Williams' statements were made during a police interrogation while at a police station. The admissions of Williams thus failed the second test of reliability disclosed in *Chambers*.

Finally, while Williams' incriminating statement was made shortly after the crime, it was made only once instead of being made to multiple persons on different occasions. In addition, the incriminating statement here was bracketed by statements denying or repudiating any criminal involvement. Unlike McDonald in *Chambers*, none of the trial testimony placed Williams at the scene of the crime or in possession of the weapon used in the crimes. It is true that one of the police officers who questioned Williams perceived that Williams was familiar with the layout of the National Supermarket, the alarm system, and that murders and a robbery had occurred. However, anyone who had been in the store and one who had experience as a security guard, as did Williams, might be familiar with the store's layout, routine and alarm system. Undoubtedly a crime of this nature caused a great deal of talk in the community as well as coverage by the news media. The fact that Williams was aware that a robbery and murders had occurred could hardly be considered an independent corroborating fact. These facts are not the same quality of corroboration that existed in *Chambers*.

Defendant also directs our attention to the testimony of Anthony Benn, who admitted to having previously implicated Williams and others in the National Supermarket robbery in a statement to police. However, Benn claimed to have done so only after being beaten and threatened by police officers. Benn repudiated his statement on the witness stand. In sum, Williams' statement was not clearly against his penal interest, it was not made spontaneously to close friends, and his statement was not corroborated by other credible evidence in the case. Accordingly, there was no violation of due process in refusing to admit Williams' statement.

### III.

Defendant's second point complains that the state was improperly permitted to introduce certain out-of-court statements made by James and Leroy Blankenship following their testimony at the trial. Defendant combines two grounds of attack on the admission of the statements. The first is that the state failed to lay a foundation showing that the out-of-court statements were inconsistent with the trial testimony. The second is that the admission of the out-of-court statements denied defendant the

right to confront and cross-examine witnesses against him, in violation of the Sixth Amendment of the United States Constitution.

Defendant does not contest the validity of the statute providing that prior inconsistent statements of a witness in a prosecution under chapters 565, 566, or 568, RSMo, if received in evidence, are substantive evidence. § 491.074. The defendant also does not contest the relatively new rule in Missouri that a party may elicit the prior inconsistent statements of that party's own witness without a showing of surprise or hostility. *State v. Bowman,* 741 S.W.2d 10, 13–14 (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988).

## A.

■ The particular statements to which defendant objects were part of separate interviews of James and Leroy conducted by police officers and recorded on videotape in November of 1987. At trial, James was asked if he had talked to his brother, Donnie, about the robbery at the National Supermarket. James denied that defendant had told him anything about the robbery. James was then asked if he had made a statement to police that Donnie told him, "They had cleared about $4,500 apiece from the robbery and murder." James admitted making a statement to police, but denied making that particular statement. Part of the recorded interview of James, offered in evidence and objected to by defendant, was James' statement, "Donnie and Marvin told me they had cleared about $4,500 apiece from this murder and robbery." The only basis for the objection presented at trial was that James' prior statement was not inconsistent with his trial testimony.

■ Whether an inconsistency exists between trial testimony and statements made prior to trial is to be determined by the whole impression and effect of what has been said and done. *State v. Nimrod,* 484 S.W.2d 475, 478 (Mo.1972); *State v. Dunn,* 731 S.W.2d 297, 300 (Mo.App.1987). Clearly, James' statement to police officers that defendant told him about the robbery was inconsistent with his trial testimony in which he denied being told anything. The trial court did not err in admitting that portion of James' statement.

## B.

■ James was also asked at trial if Donnie asked Jimmie Kennedy to return the gun. James replied, "Yeah." When asked if Donnie said anything else to Kennedy when asking for the return of the gun, James replied, "No." James was then asked if he had told police that Donnie said he needed the gun back because "it was hot." James replied, "No." A portion of the statement included in the videotaped interview of James and offered in evidence by the state was the following:

Q: [By Detective Blanks] [W]hat did Donnie, if anything, tell Jimmie to do at this time?

A: [James] Donnie wanted him to get the gun back to him for some reason.

Q: Can you remember what Donnie said?

A: Donnie just told him that he needed the gun back. It was hot.

An objection to this portion of James' statement to police was also overruled. The basis of the objection at trial was that the prior statement was not inconsistent with James' trial testimony. Again, it is obvious that the trial testimony was inconsistent with the statement made to the police. The objection was properly overruled.

## C.

■ James was asked at trial if, following the robbery, defendant had money to spend on his girlfriend. James replied, "[A]ll of us spend money." When asked if James thought it was unusual that Donnie had money during that time, James answered, "No, sometimes I give him when I was working." James was then asked if he had told police that he thought Donnie had a lot of money and was a big spender after returning from New Orleans. James replied, "No." In James' videotaped statement given to police, the following exchanges occurred:

Q: [Detective Nichols] Okay, so ah—did you notice anything different when [defendant] came back from New Orleans?

A: [James Blankenship] He had ah—ah—large amount of money ... when he came back

....

Q: Okay. Ah—now prior to the robbery, did your brother have money to take girls out?

A: No.

Q: And so, uh, this is just something that occurred afterward?

A: Right ...

These statements were also objected to as being not inconsistent with the witness's trial testimony. The objection was overruled.

The argument made here seems to be that since James admitted Donnie had money to take out girls, there was no inconsistency between what was said at trial and the previous statement. The argument is specious. As noted above, the whole impression and effect of what has been said in trial and in the out-of-court statement is considered in determining whether the two statements are inconsistent. In context, James' trial testimony that defendant's finances and spending habits were not unusual during the critical period following the robbery was squarely at odds with James' videotaped statement on the subject. The objection was properly overruled.

■ Defendant attempts to expand his trial objection in his brief. He claims the phrasing of the question, in which the prosecutor asked if defendant's spending habits were "unusual", called for an incompetent opinion or conclusion. Defendant cannot raise objections on appeal that were not interposed before the trial court or in the motion for new trial. Rule 29.11(d).

### D.

■ Leroy Blankenship testified at trial that defendant brought a gun and "small amount of money" totalling about $1,100 to Leroy's house. When asked if anyone was with defendant at the time, Leroy replied, "I don't think so." When Leroy was asked if he had told police that defendant was with Marvin Jennings when he came to the house that day, Leroy replied, "I don't remember. I might have." Among the statements included in Leroy's videotaped interview was the following exchange:

Q: [Detective Blanks] O.K., you say [defendant] brought a pistol and some money to your house.

A: [Leroy Blankenship] Yes.

Q: Do you remember when he brought this money and pistol to your house?

A: Ahh, let's see, say, I would say roughly a week after it happened.

Q: When he came to your house, was he alone?

A: Yes, he was dropped off.

Q: Do you know who dropped him off?

A: His friend, Marvin.

Q: Do you know Marvin's last name?

A: I think it's Jennings.

Q: Did you see Marvin when he dropped him off?

A: I saw him when he pulled off.

Defendant objected to the admission of the above portion of Leroy's statement when it was offered, claiming it was not inconsistent with trial testimony. Defendant argues that because Leroy admitted that a gun and money were brought to his house, that portion was not inconsistent and, because Leroy admitted that he "might have told police" that defendant was with Jennings, Leroy stood impeached and extrinsic evidence was inadmissible to further impeach him. In support of this principle defendant cites *State v. Wallach*, 389 S.W.2d 7 (Mo.1965).

The rule in *Wallach* was a corollary of the pre-*Bowman* rule that prior inconsistent statements were admissible only for purposes of impeachment. After *Bowman*, prior inconsistent statements of witnesses in certain prosecutions became substantive evidence and, as such, independently admissible "just as soon as the inconsistency appears from the testimony." 741 S.W.2d at 14. To the extent *Wallach* is inconsistent with *Bowman*, it is overruled. The state only introduced those portions of the statement showing that when defendant took the gun and money to Le-

roy's house he was accompanied by Jennings. That was inconsistent with Leroy's trial testimony. The trial court properly overruled the objection.

### E.

■ Without objection Leroy testified at trial that Donnie told him the money came from a dope house. When asked if Donnie told him how he got it from a dope house, Leroy said, "He just told me it came from a dope house." Leroy was then asked if he had told police that Donnie said he had robbed a dope house. Leroy said, "I don't know. I probably did." When Leroy was asked if he ever told police that Donnie told Leroy who was with Donnie when he robbed the dope house, Leroy stated, "I don't know. I can't remember." A portion of Leroy's statement offered by the state included the following exchange:

Q: [Detective Blanks] Did he say who was with him when he robbed the dope house?

A: [Leroy Blankenship] Marvin . . .

Defendant objected to the above statements for the reason that they were not inconsistent with trial testimony and were evidence of another crime.

Leroy's testimony that he did not know if the money came from a dope house robbery or who was with defendant was inconsistent with the statement Leroy gave to police. Again, reviewing Leroy's entire trial testimony, it was proper for the trial court to admit Leroy's prior statement.

■ The objection to the prior statement about defendant's robbing a dope house came after Leroy had been thoroughly examined regarding his testimony about the dope house robbery and after Leroy admitted to having told police about the robbery. Thus, the evidence of the "other crime" was already before the jury, and no further prejudice can be attributed to the admission of the prior inconsistent statement. In addition, defendant would derive more benefit from the jury believing he had obtained the money and gun by rob-

bing a dope house than by being a participant in the National Supermarket robbery. Under the peculiar facts of this case, defendant was not prejudiced.

### F.

■ At trial Leroy testified that the amount of money Donnie brought to Leroy's house was "about eleven hundred" dollars. When pressed, Leroy admitted he may have told police, "It might have been twelve" hundred dollars. Leroy testified that the bills were "mostly ones," although he admitted telling the police the denomination of the money was all one dollar bills. After equivocating about what the bills were, Leroy finally answered, "I don't know. I can't—I can't be sure about anything." Leroy told police in his videotaped interview:

Q: [Detective Hendricks] What were the denomination of the bills, were they fives, tens . . .

A: [Leroy Blankenship] No, they were one dollar bills.

Q: All one dollar bills?

A: Yes, sir . . .

Defendant objected to the admission of this part of the videotaped statement again, on the basis that it was not inconsistent with the trial testimony. As previously noted, after enactment of § 491.074 and the *Bowman* decision, the prior inconsistent statement is independently admissible substantive evidence once the inconsistency is established. A significant issue in this case was the denomination of the currency. A patent inconsistency exists between Leroy's trial testimony that the bills were "mostly ones" and his pretrial statement in which he unequivocally stated that the bills were *all* ones. The trial court did not err in overruling the objection.

### G.

■ In the point relied on in the brief and in the supplemental brief filed after the case was transferred to this Court, defendant argues that because James and Leroy denied[7] making some of

7. Actually only James denied making some of the statements objected to by defendant at trial.

Leroy either admitted or could not remember what he told police.

the prior inconsistent statements that were offered by the state, defendant was denied the right to confrontation and cross-examination as to those statements. No objection was made at trial that the admission of the statements of the two brothers would violate defendant's constitutional right to confrontation under the Sixth Amendment. As a general rule, a constitutional claim must be raised at the earliest opportunity and preserved at each stage of the judicial process. *State v. Hadley*, 815 S.W.2d 422, 425 (Mo. banc 1991). Review of this claim is granted *ex gratia* on a plain error basis.

In *Bowman*, this Court rejected a challenge to the constitutionality of § 491.074 as being a denial of the right to confrontation under the Sixth Amendment, at least in those situations where the witness admits making the prior inconsistent statement. 741 S.W.2d at 13. The Court declined to decide whether an inconsistent statement would be admissible as substantive evidence in criminal cases if the witness does not admit making the statement. 741 S.W.2d at 14, n. 6.

Reasons have been articulated for rejecting prior inconsistent statements where the witness denies making the statement and the only evidence showing the statement was made is the written or oral recitation of the out-of-court statement by another witness. The Court of Appeals, Eastern District, has stated that the risk of error, distortion, fabrication or undue influence in the recall or written record of the extrajudicial statement by another witness precludes admission of the out-of-court statement where the declarant denies making the statement. *State v. Oliver*, 775 S.W.2d 308, 310 (Mo.App.1989). However, a different panel of the same district of the court of appeals held that even though a witness denied making the prior statement, a videotaped prior statement is sufficiently reliable to justify its admission. *State v. Jen-*

*nings*,[8] 815 S.W.2d 434, 443–44 (Mo.App. 1991). *See also State v. Belk*, 759 S.W.2d 257 (Mo.App.1988).

The most recent decisions of the United States Supreme Court make clear that the admission of an out-of-court statement that the witness does not recall making does not violate the Confrontation Clause. *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 845, 98 L.Ed.2d 951 (1988); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 1934–38, 26 L.Ed.2d 489 (1970). The opportunity to cross-examine the declarant at trial, even though he has no recollection of what he said or if the statement was made, satisfies the confrontation requirement of the Sixth Amendment. 108 S.Ct. at 842. The United States Supreme Court also held there was no prerequisite that the prior statement be supported by indicia of reliability where the declarant is available at trial for cross-examination. 108 S.Ct. at 843.[9]

Applying those principles here, the extrajudicial statements of James and Leroy were videotaped. Although the two denied making some of the statements, both admitted to having given the videotaped interview. Nothing suggests that the recording of the statements were inaccurate, distorted or that the recording was in any way the result of creative electronic editing. Here also the defendant was given a right to conduct unlimited cross-examination of the two brothers. During that cross-examination defendant had the full opportunity to bring out such matters as bias, lack of care and attentiveness, bad memory and, most importantly here, whether the statements made to police had been coerced. In the circumstances presented here, there is no violation of the Confrontation Clause by admitting those portions of the statements of Leroy and James Blankenship that they denied having given.

8. *State v. Jennings* is the appeal of Marvin Jennings from his conviction as an accomplice of defendant's in the National Store murders and robbery.

9. This aspect of the holding in *Owens* may be inconsistent with *Oliver*. There is no necessity

here to decide the viability of the requirement in *Oliver* that the prior statement must be recorded by a reliable means to qualify for admission in evidence where the witness denies making the statement.

## IV.

▇▇ Defendant next claims that the trial court erred in giving MAI–CR3d 302.04 because its definition of "reasonable doubt" impermissibly reduces the state's burden of proof. The instruction has been repeatedly upheld. *State v. Twenter,* 818 S.W.2d 628, 634 (Mo. banc 1991); *State v. Griffin,* 818 S.W.2d 278, 282–83 (Mo. banc 1991); *State v. Murray,* 744 S.W.2d 762, 771 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Antwine,* 743 S.W.2d 51, 62–63 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); *State v. Bowman,* 741 S.W.2d at 15.

## V.

▇▇ Defendant asserts that the trial court lacked jurisdiction to enter judgment and sentence on his five second degree-felony murder convictions because he was not given notice of these charges in the indictment. In the indictment defendant was charged, in part, with five counts of first degree murder, § 565.020, and one count of first degree robbery, § 569.020. At the close of evidence the state, in addition to the five instructions on first degree murder, submitted Instructions 7, 9, 11, 13 and 15 based on MAI–CR3d 313.06, Murder in the Second Degree: Felony. Defendant objected to these instructions on the basis that they were not supported by the evidence. In his motion for new trial, defendant argued that the trial court erred in: (1) overruling his objection to these instructions; and (2) submitting the instructions to the jury. Specifically, defendant contended that these instructions informed the jury that as an alternative to the first degree murder instructions, they could find defendant guilty of the lesser offense of Murder in the Second Degree. He further stated: "[t]he lesser included offenses of Murder in the Second Degree were not supported by any evidence in the case nor was the indictment charged in the alternative."

Section 565.021.1(2) provides in pertinent part:

1. A person commits the crime of murder in the second degree if he:

. . . .

(2) Commits or attempts to commit *any* felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony. (Emphasis added.)

Thus, under § 565.021.1(2), *any* felony suffices to charge a defendant with felony murder. However, when a defendant is charged with felony murder, the jury must be instructed pursuant to MAI–CR3d 313.-06. Rule 28.02(c). The seventh Note on Use under this instruction requires that "proper notice" be given when felony murder is submitted as a lesser degree offense to first degree murder.

Here, the state failed to give defendant a specific notice that it intended to submit second degree felony murder instructions. The failure to give an instruction in violation of a Note on Use under MAI–CR constitutes error, its prejudicial effect to be judicially determined. Rule 28.02(f).

Defendant was not prejudiced. Defendant was not only charged with five counts of first degree murder, but, in a separate count of the same indictment, he was also charged with first degree robbery. Thus, defendant was placed on notice to defend a robbery. The purpose of the seventh Note on Use under § 313.06 is "[t]o furnish the accused with a description of the charge against him as will enable him to make his defense." *State v. Mace,* 357 S.W.2d 923, 925 (Mo.1962). The purpose was accomplished here by the separate count charging defendant with robbery. Thus, since defendant was not prejudiced by the absence of a specific notice, the claim is denied.

## VI.

▇▇ Defendant claims that the trial court erred when it failed to suppress a

card case, which contained a bus pass allegedly stolen in the robbery. The pass was found by officers who were searching defendant's bedroom in his mother's house pursuant to an arrest warrant. Defendant's mother gave the officers permission to kick the door in if necessary. The pass was located in a card case lying on the floor of the bedroom. The officer, Detective Joseph Burgoon, could see that the case contained defendant's driver's license. Detective Burgoon picked up the case to search it for information such as names, phone numbers or addresses that might lead police to defendant. The officer removed the license and discovered the bus pass, which he believed had been stolen from National Supermarket. The pass was No. 4300, valid for the week of September 14–20, 1987. The detective seized the card case, but no further search of defendant's room was conducted. After a hearing, defendant's motion to suppress was overruled.

When reviewing a trial court's ruling on a motion to suppress, an appellate court will affirm the ruling if the evidence is sufficient to sustain the trial court's finding. *State v. Blair*, 691 S.W.2d 259, 260 (Mo. banc 1985), *cert. dismissed*, 480 U.S. 698, 107 S.Ct. 1596, 94 L.Ed.2d 678 (1987). Upon review of a trial court's order, the facts and reasonable inferences arising therefrom are to be stated favorably to the order challenged on appeal. *Id.*

Defendant contends that the plain view exception to a warrantless search is inapplicable because the incriminating character of the card case was not immediately apparent. This argument is without merit.

The "plain view" exception to the warrant requirement applies when 1) the evidence is observed in plain view while the officer is in a place where he has a right to be; 2) the discovery is inadvertent;[10] and 3) it is apparent to the police that they have evidence before them. *State v. Schneider*,

736 S.W.2d 392, 399 (Mo. banc 1987), *cert. denied*, 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). The circumstances surrounding the discovery of the card case support the trial court's decision.

Officer Burgoon had a warrant for defendant's arrest. He was given permission to enter defendant's bedroom by defendant's mother. While in the bedroom looking for defendant, Officer Burgoon found the case lying on the floor and immediately noticed that the case contained defendant's driver's license. The officer testified at the suppression hearing that he picked up the card case and removed defendant's driver's license to see if the case held any information that could lead to defendant's whereabouts. It was reasonable for Detective Burgoon to conclude that the case might contain some evidence or clue where defendant might be found. *See State v. Collett*, 542 S.W.2d 783, 786–787 (Mo. banc 1976). Upon removing the license, the officer saw a bus pass that he recognized as being stolen. After finding the pass, Detective Burgoon seized the entire case. The trial court did not err in denying defendant's motion.

## VII.

Defendant claims the trial court erred in overruling his *Batson* challenge. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court outlined three requirements a defendant must meet in order to establish a prima facie case of purposeful racial discrimination. The court held that a defendant must show that: (1) he is a member of a cognizable racial group; (2) the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire; and (3) these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude venire persons from the petit jury on account of their race. *Id.*, 476 U.S. at 96–97, 106 S.Ct. at 1722–23.[11] The

10. The inadvertent discovery requirement is no longer a necessary component of plain view searches. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

11. Earlier this year, the Supreme Court held the second requirement under *Batson* is no longer a prerequisite to establish a prima facie case of racial discrimination. *Powers v. Ohio*, — U.S. —, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

court further held that once the defendant makes a prima facie showing, the burden shifts to the state to come forward with a neutral explanation for challenging black jurors. *Id.* Even if the trial court was incorrect in concluding that a prima facie showing was not made, the prosecutor's explanations provide a racially neutral basis for the strikes.

A summary of the prosecutor's explanations of his strikes are as follows. The prosecutor struck venire member Brown because: (1) of his appearance; (2) he indicated that crime made him nervous; (3) he indicated he did not want to serve on the jury; (4) his niece knew some individuals who were arrested in relation to this case; and (5) he indicated his views on the death penalty would substantially impair his ability to follow the court's instructions. The prosecutor struck venire member Thomas because: (1) she is old enough to be the mother of this defendant and actually has a son who is serving a sentence for murder in another state; (2) she had an uncle charged with murder; and (3) she did not understand a question that the trial judge posed. The prosecutor struck venire member Hightower because: (1) he questioned the necessity of the entire voir dire process; (2) he was angry at being in court; (3) he was not paying attention; (4) he asked if theft is criminal; and (5) he equivocated about the death penalty, thereby leading the prosecutor to question his ability to follow the court's instructions. The prosecutor struck venire person Burroughs because: (1) she had a brother-in-law who was currently serving a three year sentence for burglary and had previously served jail time; (2) although initially when she was questioned about whether she knew anybody who had been arrested, charged or convicted of a crime, she gave the information about her brother-in-law, she did not admit that she also has a cousin who was serving a sentence; (3) she lives with her parents, thus indicating a lack of stake in the community; (4) she had to continually be reminded to verbally answer

questions; and (5) she seemed upset about being corrected. The prosecutor struck venire member Ivory because: (1) he stated he could not think of any circumstances under which he would vote to impose the death penalty; (2) he has a brother who was convicted for robbing a jewelry store; and (3) he appeared to expect the state to prove that defendant had committed other offenses. The prosecutor struck venire person Harris because: (1) her husband had been arrested for murder, but was subsequently acquitted on self-defense (the prosecutor explained that this made her likely to believe that innocent people are charged with crimes and must go through a trial to prove their innocence); and (2) she indicated she could not impose the death penalty, thereby suggesting that she could not follow the court's instructions. The prosecutor struck venire person Butler because: (1) she had a brother who was convicted of, and served a sentence for, murder; and (2) she expressed that serving on the jury would impose a hardship on her because she has a son who is a disciplinary problem.

■ We review the substantive findings of the trial court. *State v. Kilgore*, 771 S.W.2d 57, 62 (Mo. banc 1989), *cert. denied*, 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164. A reviewing court will only set aside a trial court's finding as to whether the prosecutor discriminated in the exercise of his peremptory challenges if they are clearly erroneous. *Id.* A finding is deemed clearly erroneous where · the reviewing court is left with a definite and firm impression that a mistake has been committed. *Id.*

■ The trial court's finding that defendant failed to establish a prima facie case of racial discrimination was not prejudicial error. The prosecutor proffered sufficient, nonpretextual, neutral explanations for striking the seven black panel members. The state is not required to establish that its grounds would warrant excusal for

Thus, although at the time of this trial appellant had to establish all three requirements, we note

that today this would not be true.

cause. *Batson v. Kentucky*, 106 S.Ct. at 1723. Instead, the prosecutor is permitted to exercise his peremptory challenges on the basis of his legitimate "hunches" and past experiences so long as racial discrimination is not the motive. *State v. Kilgore*, 771 S.W.2d at 63. Since the trial court's ruling was not clearly erroneous, defendant's *Batson* claim is denied.

### VIII.

■ Defendant next claims that the trial court erred in overruling his motion to strike the jury venire for failing to represent a fair cross-section of the community. Specifically, defendant claims that blacks and persons 21 to 26 years of age are systematically underrepresented on St. Louis venires.

■ Defendant called Professor Kenneth Warren as an expert witness to substantiate his claim. However, the trial court found Professor Warren's testimony to be incredible, highly speculative, and unworthy of belief. In particular, it is highly speculative that the outlook of the allegedly excluded persons would be different from those a few years older. *United States v. Olson*, 473 F.2d 686, 688 (8th cir.), *cert. denied*, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973). A reviewing court does not undertake to determine the credibility of witnesses or weigh the evidence; rather a reviewing court will defer to the trial court's superior position from which to determine the credibility of the witness. *State v. Lytle*, 715 S.W.2d 910, 915–916 (Mo. banc 1986).

### IX.

■ In a related point defendant claims that § 494.010, RSMo 1986 (repealed), which excludes from jury service persons 18 to 21 years of age, violates Equal Protection[12]. The validity of this statute was upheld in *State ex rel. McNary v. Stussie*, 518 S.W.2d 630, 637 (Mo. banc 1974); *See also State v. Mansfield*, 637 S.W.2d 699, 704 (Mo. banc 1982). Moreover, the United States Supreme Court has declined to ex-

tend heightened equal protection review to differential treatment based on age. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). Defendant's Equal Protection claim is denied.

### X.

■ In his final point on appeal, defendant claims that the trial court erred in denying him an evidentiary hearing on his Rule 29.15 post-conviction motion. Defendant also challenges the constitutionality of the time limits of Rule 29.15.

■ In order to be entitled to an evidentiary hearing, a movant must 1) cite facts, not conclusions, which, if true, would entitle movant to relief; 2) the factual allegations must not be refuted by the record; and 3) the matters complained of must prejudice the movant. *Belcher v. State*, 801 S.W.2d 372, 375 (Mo.App.1990). An evidentiary hearing is not required if the motion court determines that the motion and the files and records of the case conclusively show that the movant is entitled to no relief. Rule 29.15(g). Appellate review of a motion court's action is limited to a determination of the findings and conclusions of whether the motion court are clearly erroneous. Rule 29.15(j).

The trial court was not clearly erroneous in denying defendant's motion without a hearing. No further purpose would be served by an extended discussion. This claim is denied. In addition, we have repeatedly held that the time limits of Rule 29.15 are valid and mandatory. *Day v. State*, 770 S.W.2d 692 (Mo. banc 1989), *cert. denied sub nom. Walker v. Missouri*, 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989).

ROBERTSON, C.J., COVINGTON, BENTON and THOMAS, JJ., and RENDLEN, Senior Judge, concur.

BLACKMAR, Senior Judge, concurs in separate opinion filed.

---

12. The new statute, 494.425(1), RSMo.Cum. Supp.1990, contains the same disqualification of persons less than age twenty-one years from jury service.

BLACKMAR, Senior Judge, concurring.

I concur in the disposition of the case, but write separately to comment about two important evidentiary points.

### 1. *Declarations Against Penal Interest of Unavailable Witness*

The principal opinion states "... the incriminating aspect of Williams' statement does not exonerate the defendant. That alone is sufficient justification for rejecting Williams' confession...."

I agree. The rule of *Sutter v. Easterly,* 189 S.W.2d 284 (Mo.1945), permitting the introduction of declarations against the penal interest of an unavailable witness, is a good one. There is no reason to confine its application to civil cases. A person's admission of crime carries a built-in indication of trustworthiness. It matters not that there is no 100% guarantee. The law of evidence does not require this. *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981), gives only cavalier consideration to an important point, and I would not follow it.

Nor should we receive declarations against interest in criminal cases only grudgingly, under the coercion of *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). That case set only minimum standards.

Inasmuch as the only guarantee of trustworthiness is found in the dissenting aspects of the declaration, other parts are not competent evidence. The appellant argues that the whole statement must be received. It may sometimes be necessary to receive portions of the declaration that are not disserving, but these would be subject to a limiting instruction. In this case, which did not involve a single-actor crime, Williams' guilt or innocence is not a material circumstance, and the court could properly conclude that the admissible portions had no substantial value to the defense.

The trial court also has discretion to reject a proffered declaration that seems to be utterly unreliable. This is the same discretion that applies to any evidence. Inasmuch as the rejection is supported by other adequate reasons, I shall not pursue the point.

I would, finally, overrule *State v. Rowlett,* 504 S.W.2d 48 (Mo.1973), at the first opportunity. There the Court believed that the use of declarations against interest by the prosecution was encumbered by the confrontation clauses. Recent decisions of the Supreme Court of the United States make it clear that confrontation is not a problem where admission is supported by firmly-rooted hearsay exceptions. *White v. Illinois,* —— U.S. ——, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

### 2. *Prior Inconsistent Statements*

I agree that the prior statements of witnesses were properly admitted under § 491.074, RSMo 1986, and *State v. Bowman,* 741 S.W.2d 10 (Mo. banc 1987). I would not quibble about the manner of raising the constitutional issue under the confrontation clauses. The point is implicit in the objections made.

If we are to allow prior statements as substantive evidence, it is idle to argue at length about whether the statements are "inconsistent". If the prior statements include matter that was not testified to from the stand, they are inconsistent. If they do not add anything, then their reception into evidence is harmless, unless there is a serious problem of bolstering as in *State v. Seever,* 733 S.W.2d 438 (Mo. banc 1987), which here there is not.

At the same time, I have reservations. Here the statements were on tape, and the record provides substantial corroboration. I would wonder about a case in which the only evidence of an essential element of the offense is supplied by oral testimony about what a witness said at an earlier time, when the witness denies both the making and the truth of the statement.

With these observations, I concur.